**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
***Southern Division***

| | |
|---|---|
| JONATHAN AGUILAR-VAZQUEZ, on behalf of himself and all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>RUSSELL CELLULAR, INC., and VERIZON COMMUNICATIONS, INC.,<br><br>*Defendants*. | No.<br><br>**COMPLAINT – Class Action**<br><br>JURY TRIAL DEMANDED |

Plaintiff Jonathan Aguilar-Vazquez, on behalf of himself and on behalf of all others similarly situated, alleges the following against Defendants Russell Cellular ("Russell") and Verizon Communications, Inc. ("Verizon") (together, "Defendants") upon personal knowledge as to his own acts, and based upon his investigation, his counsel's investigation, and information and belief as to all other matters.

## INTRODUCTION

1. This class action arises out of the recent data security incident and data breach that was perpetrated against Defendants (the "Data Breach"), which held in their possession certain personally identifiable information ("PII") of Plaintiff and Class Members.

2. Defendant Russell Cellular sells devices and mobile phone plans on behalf of Defendant Verizon as a Verizon Authorized Retailer with over 750 locations across 43 states.[1]

[1] *About Russell Cellular*, RUSSELL CELLULAR, https://russellcellular.com/our-story/ (last visited Apr. 10, 2026).

3. Defendant Verizon operates one of the largest wireless networks in the United States.

4. Defendant Verizon has 146.7 million total wireless retail connections, and its revenue in 2025 was $138.2 billion.[2]

5. Defendants stored Plaintiff's and Class Members' PII on behalf of Plaintiff and Class Members in connection with their Verizon phone plans and/or products.

6. Defendants owe Plaintiff and Class Members an affirmative duty to adequately protect and safeguard this private information against theft and misuse. Despite such duties created by statute, regulation, and common law, at all relevant times, Defendants utilized deficient data security practices, thereby allowing sensitive and private data to fall into the hands of strangers.

7. On or around March 17, 2026, a database of 61 gigabytes comprising of 6.3 million Russell Cellular customer records was offered for sale for $1,200 on a hacker forum.[3]

8. After the cybercriminal posted the customer data, Defendant "Verizon reached out to *Cybernews*, stating that it is aware of a 'potential threat targeting customer data.'"[4]

9. Defendant Verizon did not begin informing customers until on or around April 10, 2026, that "[o]n or about March 17, 2026, Russell Cellular informed Verizon that an unauthorized third party accessed certain customer information including customer name, phone number, the name of the price plan and a device identifier known as an IMEI."[5]

10. Defendants have not yet notified states' attorneys general.

---

[2] *Verizon Fact Sheet*, VERIZON, https://www.verizon.com/about/our-company/verizon-fact-sheet (last visited Apr. 10, 2026).
[3] Paulina Okunytė, *Verizon opens investigation into stolen customer data being sold online*, CYBERNEWS (MAR. 17, 2026), https://cybernews.com/security/russell-cellular-data-data-breach/ (last visited Apr. 10, 2026).
[4] *Id.*
[5] *See* Exhibit A.

11. But for Defendants' failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect PII, the Data Breach would not have occurred.

12. Defendants are well-aware that they are at high risk of attempted cyberattack due to the high value of the sensitive data.

13. Despite Defendants' awareness of both the value and sensitivity of the data they safeguarded and serious risk presented by insufficient security practices, Defendants did not take sufficient steps to ensure that their systems were secure. Defendants knew or should have known about the risk to the data they stored and processed, and the critical importance of adequate security measures in the face of increasing threats.

14. The Data Breach was directly and proximately caused by Defendants' failure to implement reasonable and industry-standard data security practices necessary to protect their systems from a foreseeable and preventable cyberattack. Through this wrongful conduct, the sensitive PII of Plaintiff and Class Members is now in the hands of cybercriminals, who target this sensitive data for its value to identity thieves. Plaintiff and Class Members are now at a significantly increased and impending risk of fraud, identity theft, and similar forms of criminal mischief—risks which may last the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes. Moreover, Plaintiff and Class Members have lost the inherent value of their private data.

15. By aggregating information obtained from the Data Breach with other sources or other methods, criminals can assemble a full dossier of private information on an individual to facilitate a wide variety of frauds, thefts, and scams.

16. Defendants' failure to definitively notify Plaintiff and Class Members whether they had been impacted by this data breach harmed Plaintiff and made it more difficult for Plaintiff to take swift action to respond to the breach.

17. Plaintiff and Class Members have been harmed because they are at immediate risk of having their personal information used against them. Indeed, they have been at risk well before Defendants even notified Plaintiff of the breach. Plaintiff does not know if his data has been sold, transferred, replicated, or irrevocably disseminated and exposed. He suffered harm in the loss of the value of his data which cannot be easily recovered, if ever.

18. Plaintiff, individually and on behalf of a nationwide class, alleges claims of (1) Negligence, (2) Negligence *Per Se*, (3) Breach of Implied Contract; and (4) Unjust Enrichment. Plaintiff also seeks declaratory and injunctive relief. Plaintiff asks the Court to compel Defendants to adopt reasonable information security practices to secure the sensitive PII that Defendants collect and store in their databases and to grant such other relief as the Court deems just and proper.

## PARTIES

***Plaintiff***

19. Plaintiff Jonathan Aguilar-Vazquez is and at all times mentioned herein a resident and citizen of Wyoming, Michigan.

***Defendants***

20. Defendant Russell Cellular, Inc. is a Missouri corporation with its principal place of business located at 4125 Wilson Creek Marketplace Road, Battlefield, Missouri 65619.

21. Defendant Verizon Communications, Inc. a Delaware corporation headquartered at 1095 Avenue Of The Americas, New York, New York, 10036.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than one hundred putative Class Members, and minimal diversity exists because many putative Class Members are citizens of a different state than Defendants.

23. This Court has personal jurisdiction over Defendant Russell Cellular because Defendant Russell Cellular is registered to do business in the State of Missouri; has its principal place of business in this District; conducts substantial business in this District through its headquarters, offices, and affiliates; engaged in the conduct at issue here in this District; and/or otherwise has substantial contacts with this District and purposely availed itself to the Courts in this District.

24. This Court has specific personal jurisdiction over Defendant Verizon because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District. Additionally, the exercise of personal jurisdiction is proper because Defendant Verizon has purposefully availed itself of the privileges of conducting business within this District, and has established sufficient minimum contacts within this District.

25. Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) as a substantial part of the events giving rise to the claims emanated from activities within this District. Upon information and belief, the Data Breach giving rise to this lawsuit occurred in this District.

## FACTUAL ALLEGATIONS

### I. Background

26. Defendant Russell Cellular was founded in 1993 to sell Alltell Wireless products.[6]

27. The first Russell Cellular retail location opened in 1994, and by 2008, Russell Cellular operated retail locations in Missouri, Kansas, Arkansas, and Ohio.[7]

28. "In 2009, Alltel Wireless was acquired by Verizon Wireless and all Russell Cellular stores were converted to Verizon by the close of 2009."[8] As a result, Defendant Russell expanded its reach into the Northeast, New York, and Pennsylvania.[9]

29. Defendant "Verizon Communications was created on June 30, 2000 by Bell Atlantic Corp. and GTE Corp., in one of the largest mergers in U.S. business history. GTE and Bell Atlantic evolved and grew through decades of mergers, acquisitions and divestitures."[10]

30. Defendant Verizon has 146.7 million total wireless retail connections, and its revenue in 2025 was $138.2 billion.[11]

31. Defendant Russell's Privacy Policy states that "[o]ur website is scanned on a regular basis for security holes and known vulnerabilities in order to make your visit to our site as safe as possible."[12]

32. Furthermore, Defendant Russell claims to use "regular Malware Scanning" and that

---

[6] *About Russell Cellular*, RUSSELL CELLULAR, https://russellcellular.com/our-story/ (last visited Apr. 10, 2026).
[7] *Id*
[8] *Id.*
[9] *Id.*
[10] *History and Timeline*, VERIZON, https://www.verizon.com/about/our-company/history-and-timeline (last visited Apr. 10, 2026).
[11] *Verizon Fact Sheet*, VERIZON, https://www.verizon.com/about/our-company/verizon-fact-sheet (last visited Apr. 10, 2026).
[12] *Privacy Policy*, RUSSELL CELLULAR, https://russellcellular.com/privacy-policy/ (last visited Apr. 10, 2026).

"personal information is contained behind secured networks and is only accessible by a limited number of persons who have special access rights to such systems, and are required to keep the information confidential." [13]

33. Additionally, Defendant Russell claims to protect all financial information as follows: "all sensitive/credit information you supply is encrypted via Secure Socket Layer (SSL) technology. We implement a variety of security measures when a user places an order enters, submits, or accesses their information to maintain the safety of your personal information."[14] Accordingly, "[a]ll payment transactions are processed through a Verizon gateway and websites and are not stored or processed on our servers."[15]

34. Defendant Verizon claims to "use technical, administrative and physical safeguards to help protect against unauthorized access to, use or disclosure of information we collect or store. In addition, we train our employees on the importance of privacy and security, as well as the proper ways to access, use and disclose customer information."[16]

35. Plaintiff and Class Members provided their PII to Defendants with the reasonable expectation and on the mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

36. As a result of collecting and storing the PII of Plaintiff and Class Members for their own financial benefit, Defendants had a continuous duty to adopt and employ reasonable measures to protect Plaintiff's and Class Members' PII from disclosure to third parties.

---

[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Full Privacy Policy*, VERIZON, https://www.verizon.com/about/privacy/full-privacy-policy#acc-item-32 (last visited Apr. 10, 2026).

## II. The Data Breach

37. On or around March 17, 2026, a database of 61 gigabytes comprising of 6.3 million Russell Cellular customer records was offered for sale for $1,200 on a hacker forum.[17]

38. After the cybercriminal posted the customer data, Defendant "Verizon reached out to *Cybernews*, stating that it is aware of a 'potential threat targeting customer data.'"[18]

39. Defendant Verizon did not begin informing customers until on or around April 10, 2026, that "[o]n or about March 17, 2026, Russell Cellular informed Verizon that an unauthorized third party accessed certain customer information including customer name, phone number, the name of the price plan and a device identifier known as an IMEI."[19]

40. Through the Data Breach, the cybercriminal gained unauthorized access to highly sensitive PII.

41. Defendants have not yet notified states' attorneys general.

42. The Data Breach Notices do not provide details about the root cause of the Data Breach, the vulnerabilities exploited, the criminals responsible for the breach, and the remedial measures undertaken to ensure such a breach does not occur again. To date, Defendants have not explained or disclosed these facts to Plaintiff and Class Members.

43. Without these details, Plaintiff's and Class Members' ability to mitigate harms resulting from the Data Breach is severely diminished.

44. Defendants' Data Breach notice offers no substantive steps to help victims like Plaintiff and Class Members to protect themselves, which is woefully inadequate considering the

---

[17] Paulina Okunytė, *Verizon opens investigation into stolen customer data being sold online*, CYBERNEWS (MAR. 17, 2026), https://cybernews.com/security/russell-cellular-data-data-breach/ (last visited Apr. 10, 2026).

[18] *Id.*

[19] *See* Exhibit A.

lifelong increased risk of fraud and identity theft that Plaintiff and Class Members now face as a result of the Data Breach.

## III. The Data Breach was Preventable

45. At all relevant times, Defendants knew, or should have known, that the PII they were entrusted with was a prime target for malicious actors. Defendants knew this given the unique type and the significant volume of data on their networks, servers, and systems, comprising individuals' detailed and confidential personal information and, thus, the significant number of individuals for whom the exposure of the unencrypted data would harm.

46. As custodians of Plaintiff's and Class Members' PII, Defendants knew or should have known the importance of protecting their PII, and of the foreseeable consequences and harms to such persons if any data breach occurred. Defendants' security obligations were also especially important due to the substantial increase of cyberattacks and data breaches in recent years, particularly those targeting businesses and other organizations like Defendants, which store and maintain large volumes of PII.

47. In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[20] The 330 reported breaches in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.

48. Cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiff's and the Class's PII Cybercriminals can cross-reference the data stolen from the Data Breach and combine with other

---

[20] 2021 Data Breach Annual Report, ITRC, https://www.wsav.com/wp-content/uploads/sites/75/2022/01/20220124_ITRC-2021-Data-Breach-Report.pdf (last accessed April 3, 2025).

sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiff's and the Class's financial accounts.

49. On information and belief, Defendants failed to adequately train and supervise their IT and data security agents and employees on reasonable cybersecurity protocols or implement reasonable security measures, causing them to lose control over the PII in their possession. Defendants' negligence is evidenced by their failure to prevent the Data Breach and stop cybercriminals from accessing the PII.

## IV. Defendants Failed to Comply with FTC Guidelines

50. At all times relevant to this Complaint, Defendants knew or should have known the significance and necessity of safeguarding the PII in their possession, and the foreseeable consequences of a data breach. Defendants knew or should have known that because they collected and maintained the PII for millions of individuals, millions of individuals would be harmed by a breach of its systems. Defendants further knew that the data they were entrusted with was highly valuable and contained private and sensitive information including medical information.

51. Because PII is so sensitive and cyberattacks have become a rising threat, the FTC has issued numerous guides for businesses holding sensitive PII and emphasized the importance of adequate data security practices. The FTC also stresses that appropriately safeguarding PII held by businesses should be factored into all business-related decision making.

52. An FTC Publication titled "Protecting Personal Information: A Guide for Business" lays out fundamental data security principles and standard practices that businesses should implement to protect PII.[21] The guidelines highlight that businesses should (a) protect the personal

[21] *See Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited June 30, 2025).

customer information they collect and store; (b) properly dispose of personal information that is no longer needed; (c) encrypt information stored on their computer networks; (d) understand their network's vulnerabilities; and (e) implement policies to correct security problems.

53. The FTC also recommends businesses use an intrusion detection system, monitor all incoming traffic to the networks for unusual activity, monitor for large amounts of data being transmitted from their systems, and have a response plan prepared in the event of a breach.

54. The FTC also recommends that businesses limit access to sensitive PII, require complex passwords to be used on the networks, use industry-tested methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.

55. Businesses that do not comply with the basic protection of sensitive PII are facing enforcement actions brought by the FTC. Failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data is an unfair act or practice prohibited pursuant to Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.

56. Many states' unfair and deceptive trade practices statutes are similar to the FTC Act, and many states adopt the FTC's interpretations of what constitutes an unfair or deceptive trade practice.

57. Defendants knew or should have known of their obligation to implement appropriate measures to protect Plaintiff's and Class Members' PII but failed to comply with the FTC's basic guidelines.

58. Defendants' failure to employ reasonable measures to adequately safeguard against unauthorized access to PII constitutes an unfair act or practice as prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45, as well as by state statutory analogs.

59. Once Defendants became aware of the breach, they could have acted far faster and more aggressively in responding to the breach and in assisting victims in redressing harms.

60. Identity thieves use such PII to, among other things, gain access to bank accounts, social media accounts, and credit cards. Identity thieves can also use this PII to open new financial accounts, open new utility accounts, obtain medical treatment using victims' health insurance, file fraudulent tax returns, obtain government benefits, obtain government identification cards, or create "synthetic identities." Additionally, identity thieves often wait significant amounts of time—months or even years—to use the PII obtained in data breaches because victims often become less vigilant in monitoring their accounts as time passes, therefore making the PII easier to use without detection. These identity thieves will also re-use stolen PII, resulting in victims of one data breach suffering the effects of several cybercrimes from one instance of unauthorized access to their PII.

61. Furthermore, data breaches involving IMEI device identifiers, such as this one, allow unauthorized actors to "detect whether the device has a carrier lock or if it was reported stolen or lost."[22] IMEI device identifiers "also contain[] location information, such as the country or region where the IMEI was registered and the smartphone was used."[23]

62. Unauthorized actors can also "can clone [] smartphone[s] by programming the same IMEI onto another device."[24] This then allows "[t]he cloned device [to] be used for fraudulent

---

[22] *What Can Someone Do with My IMEI Number? Risks and Protective Measures*, NSYS GROUP (JAN. 30, 2025), https://nsysgroup.com/blog/what-can-someone-do-with-my-imei-number/ (last visited Apr. 10, 2026).
[23] *Id.*
[24] *Id.*

activities, which may result in serious consequences" such as blacklisting, cutting off access to mobile networks, or committing illegal acts in the original user's name.[25]

## V. Defendants Failed to Comply with Industry Standards

63. Security standards for businesses storing PII commonly include, but are not limited to:

a) Maintaining a secure firewall

b) Monitoring for suspicious or unusual traffic on the website

c) Looking for trends in user activity including for unknown or suspicious users

d) Looking at server requests for PII

e) Looking for server requests from VPNs and Tor exit nodes

f) Requiring Multi-factor authentication before permitting new IP addresses to access user accounts and PII

g) Structuring a system including design and control to limit user access as necessary, including a user's access to the account data and PII of other users.

64. Other best practices include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

65. Defendants failed to meet minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR- DS-02, PR.DS-10,

---

[25] *Id.*

PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM- 06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIC CSC), which are all established standards in reasonable cybersecurity readiness.

66. These frameworks are existing and applicable industry standards which Defendants failed to comply with.

## VI. Plaintiff's and Class Members' Experiences.

67. Plaintiff received notice of the Data Breach from Defendant Verizon on or around April 10, 2026, informing him that his sensitive information— "customer name, phone number, the name of the price plan and a device identifier known as an IMEI"—may have been part of Defendants' Data Breach.[26]

68. Prior to the Data Breach, Plaintiff has always taken reasonable precautions to protect his data.

69. Plaintiff provided Defendants with his most sensitive personal information and cannot be sure how much of it was exfiltrated.

70. Plaintiff suffered an actual injury in the form of damages and diminution in the value of his PII—a form of tangible property that Plaintiff entrusted to Defendants, which was compromised in and because of the Data Breach. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach.

71. Plaintiff has suffered imminent and impending injury arising from the heightened risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of criminals.

---

[26] *See* Exhibit A.

72. Plaintiff has a continuing interest in ensuring that his PII, which upon information and belief, remains backed up in Defendants' possession, is protected, and safeguarded from future breaches.

## VII. Defendants Breached Their Obligations to Plaintiff and the Class

73. Defendants fail to offer any compensation to victims of the Data Breach, who commonly face multiple years of ongoing identity theft, and they entirely fail to provide any compensation for the unauthorized release and disclosure of Plaintiff's and Class Members' PII, out-of-pocket costs, and the time taken by Plaintiff and Class Members to mitigate their injuries.

74. Plaintiff and Class Members have been damaged by the compromise and exfiltration by cybercriminals of their PII as a result of the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of the Data Breach.

75. Plaintiff and Class Members were damaged since their PII is being sold or potentially for sale by cybercriminals in the years to come.

76. As a direct and proximate consequence of Defendants' conduct, Plaintiff and Class Members have been placed at an imminent, actual, and substantial risk of harm from fraud and identity theft, especially considering the actual fraudulent misuse of the PII that has already taken place.

77. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach.

78. Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. Plaintiff and Class

Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

79. Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their PII as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

80. Plaintiff and Class Members also suffered a loss of value of their PII when it was acquired by cybercriminals in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

81. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

82. Many Class Members suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a. Finding fraudulent charges;

b. Cancelling and reissuing credit and debit cards;

c. Purchasing credit monitoring and identity theft prevention;

d. Monitoring their medical records for fraudulent charges and data;

e. Addressing their inability to withdraw funds linked to compromised accounts;

f. Taking trips to banks and waiting in line to obtain funds held in limited accounts;

g. Placing "freezes" and "alerts" with credit reporting agencies;

h. Spending time on the phone with or at a financial institution to dispute fraudulent charges;

i. Contacting financial institutions and closing or modifying financial accounts;

j. Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

k. Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

l. Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

83. Moreover, Plaintiff and Class Members have an interest in ensuring that their PII, which is believed to remain in the possession of Defendants, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information as well as health information is not accessible online and that access to such data is password protected.

## CLASS ACTION ALLEGATIONS

84. Plaintiff brings this class action on behalf of himself and all other similarly situated individuals under Federal Rule of Civil Procedure 23 on behalf of the following class (the "Class"):

> All individuals within the United States whose PII was identified as compromised in the Data Breach.

85. Excluded from the Class are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, coconspirators, successors, subsidiaries, and assigns. Also excluded from the Class are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

86. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements therein.

87. **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. Plaintiff estimates that the Class is comprised of millions of Class Members. The Class is sufficiently numerous to warrant certification.

88. **Commonality.** Common legal and factual questions exist that predominate over any questions affecting only individual Class Members. These common questions, which do not vary among Class Members and which may be determined without reference to any Class Member's individual circumstances, include, but are not limited to:

a) Whether Defendants failed to take adequate and reasonable measures to ensure their websites and data systems were protected;

b) Whether Defendants failed to take available steps to prevent and stop the breach from happening or mitigating the risk of a long-term breach;

c) Whether Defendants unreasonably delayed in notifying Plaintiff and Class Members of the harm they suffered once the suspicious activity was detected;

d) Whether Defendants owed a legal duty to Plaintiff and Class Members to protect their PII;

e) Whether Defendants breached any duty to protect the personal information of Plaintiff and Class Members by failing to exercise due care in protecting their PII;

f) Whether Defendants took sufficient steps to secure Class Members' PII;

g) Whether Defendants were unjustly enriched;

h) Whether Plaintiff and Class Members are entitled to actual, statutory, or other forms of damages and other monetary relief; and,

i) Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief or restitution.

89. **Typicality.** Plaintiff's claims are typical of other Class Members' claims because Plaintiff and Class Members were subjected to the same allegedly unlawful conduct and damaged in the same way.

90. **Adequacy of Representation.** Plaintiff is an adequate class representative because he is a Class Member, and his interests do not conflict with the Class's interests. Plaintiff retained counsel who are competent and experienced in class action and data breach litigation. Plaintiff and his counsel intend to prosecute this action vigorously for the Class's benefit and will fairly and adequately protect his interests.

91. **Predominance and Superiority.** The Class can be properly maintained because the above common questions of law and fact predominate over any questions affecting individual Class Members. A class action is also superior to other available methods for the fair and efficient adjudication of this litigation because individual litigation of each Class Member's claim is impracticable. Even if each Class Member could afford individual litigation, the court system could not. It would be unduly burdensome if thousands of individual cases proceed. Individual litigation also presents the potential for inconsistent or contradictory judgments, the prospect of a race to the courthouse, and the risk of an inequitable allocation of recovery among those with equally meritorious claims. Individual litigation would increase the expense and delay to all parties and the courts because it requires individual resolution of common legal and factual questions. By contrast, the class-action device presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

92. **Declaratory and Injunctive Relief.** The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendants. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class Members and impair their interests. Defendants have acted and/or refused to act on grounds generally applicable to the Class, making final injunctive relief or corresponding declaratory relief appropriate.

## CLAIMS FOR RELIEF

### Count 1
### Negligence
### On behalf of Plaintiff and the Class

93. Plaintiff, individually and on behalf of the Class, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

94. Plaintiff and Class Members entrusted their PII to Defendants with the understanding that they would safeguard their PII.

95. Defendants had full knowledge of the sensitivity of the PII that they stored and the types of harm that Plaintiff and Class Members could and would suffer if that PII were wrongfully disclosed.

96. Defendants violated their duty to implement and maintain reasonable security procedures and practices. That duty includes, among other things, designing, maintaining, and testing Defendants' information security controls sufficiently rigorously to ensure that PII in their possession was adequately secured by, for example, encrypting sensitive personal information, installing effective intrusion detection systems and monitoring mechanisms, using access controls to limit access to sensitive data, regularly testing for security weaknesses and failures, failing to

notify victims of the specific breached data in a timely manner, and failing to remedy the continuing harm by unreasonably delaying notifying specific victims who were harmed.

97. Defendants' duty of care arose from, among other things,

a) The special relationship between Defendants, Plaintiff, and Class Members resulting from Plaintiff and Class Members entrusting Defendants with confidential PII;

b) Defendants' exclusive ability (and Class Members' inability) to ensure that their systems, websites, and vendor services were sufficient to protect against the foreseeable risk that a data breach could occur;

c) Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, failing to adopt reasonable data security measures; and

d) Defendants' common law duties to adopt reasonable data security measures to protect PII under their possession and to act under the same or similar circumstances as a reasonable and prudent person would act.

98. Plaintiff and Class Members were the foreseeable victims of Defendants' inadequate data security. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches. Defendants knew that a breach of their systems could and would cause harm to Plaintiff and Class Members.

99. Defendants' conduct created a foreseeable risk of harm to Plaintiff and Class Members. Defendants' conduct included their failure to adequately mitigate harm through negligently failing to inform victims of the breach of the specific information breached.

100. Defendants knew or should have known of the inherent risks in collecting and storing massive amounts of PII and the importance of limiting disclosure of that PII.

101. Defendants, through their actions and inactions, breached their duty owed to Plaintiff and Class Members by failing to exercise reasonable care in safeguarding their PII while it was in their possession and control. Defendants breached their duty by, among other things, their failure to adopt reasonable data security practices and their failure to adopt reasonable security and notification practices, failure to monitor the security of their networks and systems, and allowing unauthorized access to Plaintiff's and Class Members' PII.

102. Defendants inadequately safeguarded PII in breach of standard industry rules, regulations, and best practices at the time of the Data Breach.

103. But for Defendants' breach of their duty to adequately protect Class Members' PII, Class Members' PII would not have been stolen.

104. There is a temporal and close causal connection between Defendants' failure to implement adequate data security measures and notification practices, the Data Breach/unauthorized disclosure, and the harms suffered by Plaintiff and Class Members.

105. As a result of Defendants' failure to timely notify Plaintiff and Class Members that their PII had been compromised, Plaintiff and Class Members are unable to take the necessary precautions to mitigate damages by preventing future fraud.

106. As a direct and traceable result of Defendants' negligence, Plaintiff and Class Members suffered and will continue to suffer damages, including monetary damages, increased risk of future harm, loss of time and costs associated with the prevention, detection, and recovery from unauthorized use of their personal information; the continued risk to their personal information; future costs in terms of time, effort, and money that will be required to prevent, detect,

and repair the impact of the personal information compromised as a result of the Data Breach, overpayment for the services and products that were received without adequate data security; and embarrassment, humiliation, and emotional distress.

107. Plaintiff and Class Members are entitled to all forms of monetary compensation set forth herein, including monetary payments to provide adequate identity protection services. Plaintiff and Class Members are also entitled to the injunctive relief sought herein.

108. Plaintiff also seeks such other relief as the Court may deem just and proper.

**Count 2**
**Negligence *Per Se***
**On behalf of Plaintiff and the Class**

109. Plaintiff, individually and on behalf of the Class, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

110. Section 5 of the FTC Act, 15 U.S.C. § 45 prohibits, "unfair. . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by Defendants of failing to use reasonable measures to protect Plaintiff's and Class Members' PII.

111. Defendants violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect Plaintiff's and Class Members' PII and by failing to comply with industry standards.

112. Defendants' conduct was particularly unreasonable given the nature and amount of PII obtained and stored and the foreseeable consequences of a data breach on Defendants' systems. Plaintiff was required to provide PII to Defendants. Plaintiff and Class Members entrusted their PII to Defendants with the understanding that Defendants would safeguard their PII.

113. Class Members are within the class of persons Section 5 of the FTC Act (and similar state statutes) was intended to protect.

114. Defendants' failure to comply with applicable laws and regulations constitutes negligence *per se*.

115. But for Defendants' wrongful and negligent breach of their duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

116. The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they failed to meet their duties, and that Defendants' breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their PII.

117. As a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

**Count 3**
**Breach of Implied Contract**
**On behalf of Plaintiff and the Class**

118. Plaintiff, individually and on behalf of the Class, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

119. Plaintiff and Class Members contracted with Defendant Russell Cellular, who contracted with Defendant Verizon.

120. Plaintiff and Class Members provided and entrusted their PII to Defendants as part of Defendants' regular business practices.

121. Plaintiff and Class Members entrusted their PII to Defendants. In so doing, Plaintiff and Class Members entered into implied contracts with Defendants by which Defendants agreed

to safeguard and protect PII, and to timely and accurately notify Plaintiff and the Class if their data has been breached and compromised or stolen.

122. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendants' data security practices complied with relevant laws and regulations and were consistent with industry standards.

123. Implicit in the agreement between Plaintiff, Class Members, and Defendants to provide PII, was Defendants' obligation to: (1) use such PII for business purposes only, (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class Members' PII, (3) prevent unauthorized disclosures of the PII and (4) retain PII only under conditions that kept such information secure and confidential.

124. As part of these transactions, Defendants agreed to safeguard and protect the PII of Plaintiff and Class Members and to timely and accurately notify them if their PII was breached or compromised.

125. Plaintiff and Class Members entered into the implied contracts with the reasonable expectation that Defendants' data security practices and policies were reasonable and consistent with the legal requirements, industry standards, and Defendants' own representations.

126. Implicit in the agreement between Defendants, Plaintiff, and Class Members, was the obligation that all parties would maintain information confidentially and securely.

127. These exchanges constituted an agreement and meeting of the minds between the parties.

128. When the parties entered into an agreement, mutual assent occurred. Plaintiff and Class Members would not have provided and entrusted their PII to Defendants in the absence of

the implied contract or implied terms between them and Defendants. The safeguarding of the PII of Plaintiff and Class Members was critical to realize the intent of the parties.

129. Plaintiff and Class Members fully performed their obligations under the implied contracts with Defendants.

130. Defendants breached their implied contracts with Plaintiff and Class Members to protect their PII when they (1) failed to take reasonable steps to use safe and secure systems to protect that information; (2) failed to comply with industry standards; (3) failed to comply with the legal obligations necessarily incorporated into these agreements; and (4) failed to notify Plaintiff and Class Members of the specific data breached in a reasonably timely manner.

131. As a direct and proximate result of Defendants' breach of implied contract, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, medical identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of their PII; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Defendants' Data Breach; lost benefit of their bargains and

overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

132. As a direct and proximate result of the breach/unauthorized disclosure, Plaintiff and Class Members are entitled to relief as set forth herein.

133. Plaintiff also seeks such other relief as the Court may deem just and proper.

**Count 4**
**Unjust Enrichment**
**On behalf of Plaintiff and the Class**

134. Plaintiff, individually and on behalf of the Class, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

135. This count is brought in the alternative to Plaintiff's breach of contract claim.

136. Plaintiff and Class Members conferred a benefit on Defendants when they paid Defendants for their goods and services and provided their PII to Defendants.

137. Upon information and belief, the monies paid to Defendants in the ordinary course of business included a premium for Defendants' cybersecurity obligations and were supposed to be used by Defendants, in part, to pay for the administrative and other costs of providing reasonable data security and protection for Plaintiff's and Class Members' PII.

138. Defendants, however, failed to secure Plaintiff's and Class Members' PII and, therefore, did not provide adequate data security in return for the benefit Plaintiff and Class Members provided.

139. Defendants would not be able to carry out an essential function of their regular business without the money obtained in the ordinary course of business and PII provided by Plaintiff and Class Members. Plaintiff and Class Members expected that Defendants or anyone in Defendants' position would use a portion of that revenue to fund adequate data security practices.

140. Defendants acquired the PII through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

141. Defendants knew that Plaintiff and Class Members conferred a benefit upon them, which Defendants accepted. Defendants profited from these transactions and used the PII of Plaintiff and Class Members for business purposes, while failing to use the payments they received for adequate data security measures that would have secured Plaintiff's and Class Members' PII and prevented the Data Breach.

142. If Plaintiff and Class Members knew that Defendants had not reasonably secured their PII, they would not have provided their PII to Defendants.

143. Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants instead calculated to increase their own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures and cheaper contractors and diverting those funds to their own profits. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize their own profits over the requisite security and the safety of their PII.

144. Under the principles of equity and good conscience, Defendants should not be permitted to retain the benefits that Plaintiff and Class Members conferred upon them.

145. Plaintiff and Class Members have no adequate remedy at law.

146. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered or will suffer injuries described herein.

147. Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them. In the alternative, Defendants should be compelled to refund the amounts that Plaintiff and Class Members overpaid to Defendants.

148. Plaintiff also seeks such other relief as the Court may deem just and proper.

**Count 5**
**Violations of Missouri Merchandising Practices Act,**
**RSMo. § 407.010 *et seq*.**
**(On Behalf of Plaintiffs and All Class Members)**

149. Plaintiffs re-allege and incorporate by reference all of the allegations contained in the forgoing paragraphs, as if fully set forth herein.

150. RSMo. § 407.020 prohibits the use of any "deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce"…

151. An "unfair practice" is defined by Missouri law, 15 CSR 60-8.020, as any practice which:

(A) Either-

1. Offends any public policy as it has been established by the Constitution, statutes or common law of this state, or by the Federal Trade Commission, or its interpretive decisions; or

2. Is unethical, oppressive or unscrupulous; and

(B) Presents a risk of, or causes, substantial injury to consumers.

152. An "unfair practice is defined by Missouri law, 15 CSR 60-8.020 (1)(B) provides that an "Unfair Practice in General" is

(1) An unfair practice is any practice which –

(A) Either –

1. <u>Offends any public policy</u> as it has been established by the Constitution, <u>statutes</u> or common law of this state, or by the Federal Trade Commission, or its interpretive decisions; or

2. Is unethical, oppressive or unscrupulous; and

(B) Presents a risk of, or causes, <u>substantial injury to consumers</u>.

153. 15CSR 60-8.040 provides that an "Unfair Practice is: An unfair practice for any person in connection with the advertisement or sale of merchandise to violate the duty of good faith in solicitation, negotiation and performance, or in <u>any manner fail to act in good faith</u>.

154. Plaintiffs and Defendants are "persons" within the meaning of section 407.010 (5).

155. Merchandise is defined by the MMPA, to include the providing of "services" and, therefore, encompasses cellular and data privacy services. Cellular and data privacy services are a good.

156. Efforts to maintain the privacy and confidentiality of medical records are part of the healthcare services associated with a good.

157. Maintenance of medical records are "merchandise" within the meaning of section 407.010(4).

158. Plaintiffs' and the Class' goods and services purchased from Defendants were for "personal, family or household purposes" within the meaning of the Missouri Merchandising Practices Missouri Revised Statutes.

159. As set forth herein, Defendants' acts, practices and conduct violate section 407.010(1) in that, among other things, Defendants have used and/or continues to use unfair practices, concealment, suppression and/or omission of material facts in connection with the

advertising, marketing, and offering for sale of services associated with their services. Such acts offend the public policy established by Missouri statute and constitute an "unfair practice" as that term is used in Missouri Revised Statute 407.020(1).

160. Defendants' unfair, unlawful and deceptive acts, practices and conduct include: (1) representing to its patients that it will not disclose their sensitive personal health information to an unauthorized third party or parties; (2) failing to implement security measures such as securing the records in a safe place; and (3) failing to train personnel.

161. Defendants' conduct also violates the enabling regulations for the MMPA because it: (1) offends public policy; (2) is unethical, oppressive and unscrupulous; (3) causes substantial injury to consumers; (4) it is not in good faith; (5) is unconscionable; and (6) is unlawful. *See* Mo Code Regs. Ann tit. 15, Section 60-8.

162. As a direct and proximate cause of Defendants' unfair and deceptive acts, Plaintiffs and members of the Class have suffered damages in that they (1) paid more for privacy protections than they otherwise would have, and (2) paid for privacy protections that they did not receive. In this respect, Plaintiffs and members of the Class have not received the benefit of the bargain and have suffered an ascertainable loss.

163. Plaintiffs, on behalf of themselves and the Class, seek actual damages for all monies paid to Nationstar in violation of the MMPA. In addition, Plaintiffs seek attorneys' fees.

**Count 6**
**Injunctive/Declaratory Relief**
**On behalf of Plaintiff and the Class**

164. Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant

further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal and state statutes described herein.

165. Defendants owe a duty of care to Plaintiff and Class Members, which required Defendants to adequately monitor and safeguard Plaintiff's and Class Members' PII.

166. Defendants and their officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns still possess the PII belonging to Plaintiff and Class Members.

167. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and whether Defendants are currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Plaintiff alleges that Defendants' data security measures remain inadequate. Furthermore, Plaintiff and the Class continue to suffer injury as a result of the compromise of their PII and the risk remains that further compromises of their private information will occur in the future.

168. Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendants owe a legal duty to adequately secure the PII of Plaintiff and the Class within their care, custody, and control under the common law, and Section 5 of FTC Act;

b. Defendants breached their duty to Plaintiff and the Class by allowing the Data Breach to occur;

c. Defendants' existing data monitoring measures do not comply with their obligations and duties of care to provide reasonable security procedures and

practices that are appropriate to protect the PII of Plaintiff and the Class within Defendants' custody, care, and control; and

d. Defendants' ongoing breaches of said duties continue to cause harm to Plaintiff and the Class.

169. This Court should also issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with industry standards to protect the PII of Plaintiff and the Class within their custody, care, and control, including the following:

a. Order Defendants to provide lifetime credit monitoring and identity theft insurance and protection services to Plaintiff and Class Members; and

b. Order that, to comply with Defendants' obligations and duties of care, Defendants must implement and maintain reasonable security and monitoring measures, including, but not limited to:

i. Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems, networks, and servers on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

ii. Encrypting and anonymizing the existing PII within their servers, networks, and systems to the extent practicable, and purging all such information which is no longer reasonably necessary for Defendants to provide their services;

iii. Engaging third-party security auditors and internal personnel to run automated security monitoring;

iv. Auditing, testing, and training their security personnel regarding any new or modified procedures;

v. Segmenting their user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendants' systems, networks, and servers;

vi. Conducting regular database scanning and security checks; and

vii. Routinely and continually conducting internal training and education to inform Defendants' internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

170. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach or cybersecurity incident. This risk is real, immediate, and substantial. If another data breach or cybersecurity incident occurs, Plaintiff and the Class will not have an adequate remedy at law because monetary relief alone will not compensate Plaintiff and the Class for the serious risks of future harm.

171. The hardship to Plaintiff and the Class if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Plaintiff and the Class will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of Defendants' compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

172. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach or

cybersecurity incident, thus preventing future injury to Plaintiff and the Class and other persons whose PII would be further compromised.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class set forth herein, respectfully requests the following relief:

A. That the Court certify this action as a class action and appoint Plaintiff and his counsel to represent the Class;

B. That the Court grant permanent injunctive relief to prohibit Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein and directing Defendants to adequately safeguard the PII of Plaintiff and the Class by implementing improved security controls;

C. That the Court award compensatory, consequential, and general damages, including nominal damages as appropriate, as allowed by law in an amount to be determined at trial;

D. That the Court award statutory or punitive damages as allowed by law in an amount to be determined at trial;

E. That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of Defendants' unlawful acts, omissions, and practices;

F. That the Court award to Plaintiff and Class Members the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

G. That the Court award pre- and post-judgment interest at the maximum legal rate; and

H. All such other relief as it deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all claims so triable.

Dated: April 10, 2026

Respectfully submitted,

*/s/Maureen M. Brady*

Maureen M. Brady (MO#57800)
**McSHANE & BRADY, LLC**
4006 Central Street
Kansas City, MO 64111
Tel: (816) 888-8010
Fax: (816) 332-6295
mbrady@mcshanebradylaw.com

Amber L. Schubert* (CA Bar No.278696)
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union St, Ste 200
San Francisco, CA 94123
Tel: 415-788-4220
Fax: 415-788-0161
aschubert@sjk.law

*Counsel for Plaintiff and the Proposed Class*

*pro hac vice forthcoming