**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
***Southern Division***

| | |
|---|---|
| JONATHAN AGUILAR-VAZQUEZ, ADESSA CONSULTING, INC. and TINA BURNS, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>RUSSELL CELLULAR, INC., and CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS,<br><br>*Defendants*. | Case No. 6:26-cv-03218-MBB<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiffs Jonathan Aguilar-Vazquez, Adessa Consulting, Inc., and Tina Burns, on behalf of themselves and all others similarly situated, allege the following against Defendants Russell Cellular, Inc. ("Russell Cellular") and Cellco Partnership d/b/a Verizon Wireless ("Verizon") (collectively, "Defendants"), based upon their personal knowledge as to their own acts and experiences and, as to all other matters, upon information and belief, including the investigation conducted by Plaintiffs and their counsel.

## INTRODUCTION

1. This class action arises from a data security incident involving Russell Cellular, a Verizon authorized retailer, in which unauthorized actors accessed sensitive customer information maintained by Defendant Russell Cellular (the "Data Breach").

2. Russell Cellular sells wireless devices, service plans, and related products and services under the Verizon brand through more than 750 retail locations across 43 states.[1]

3. Verizon is one of the largest wireless telecommunications providers in the United States.[2]

4. In connection with Russell's sale of wireless products and Verizon's cellular services, Plaintiffs, Class (defined below) and Subclass Members (defined below) provided personal, account, business, and other sensitive information to Defendants in connection with their purchase of wireless products and services. Russell Cellular also generated, maintained, stored, names, phone numbers, email addresses, account numbers, invoice and tracking numbers, device identifiers (including International Mobile Equipment Identity "IMEI" numbers), contract information, wireless plan information, and other information capable of identifying or being associated with a particular individual, account, device, or business entity (collectively, "Personally Identifiable Information" or "PII").

5. Russell Cellular maintained a privacy policy (the "Russell Privacy Policy") that stated that it maintained personal data behind secured networks and that only a limited number of third parties had access to that information.

6. Verizon exercised oversight and control over its authorized retailer network and was responsible for ensuring the institution of reasonable safeguards for customer information

---

[1] *About Russell Cellular*, RUSSELL CELLULAR, https://russellcellular.com/our-story/ (last visited June 10, 2026).
[2] *Verizon Fact Sheet*, VERIZON, https://www.verizon.com/about/our-company/verizon-fact-sheet (last visited June 10, 2026).

maintained on its behalf and in compliance with its privacy policy (the "Verizon Privacy Policy") with Plaintiffs and Class Members.[3]

7. Plaintiffs and Class Members entrusted their information to Russell Cellular with the reasonable expectation that Defendants would implement and maintain adequate safeguards to protect that information from unauthorized access, disclosure, theft, and misuse.

8. Defendant Russell Cellular owes Plaintiffs and Class Members duties arising from common law, statute, contract, industry standards, and their own representations to safeguard this information and to timely notify affected individuals and entities in the event of unauthorized access. Defendant Verizon owed Plaintiffs and Class Members common law and contractual duties to protect their PII.

9. On or around March 17, 2026, threat actors offered for sale on a hacker forum a database maintained by Russell Cellular containing approximately 61 gigabytes of data and records relating to approximately 6.3 million customers.[4]

10. This information was subsequently offered for sale on the dark web by a threat actor, and exposed Plaintiffs' and Class Members PII, telecom account data, device identifiers, and employee credentials.

11. To date, Russell Cellular has still not sent Plaintiffs or Class Members notice of the Data Breach, leaving them exposed and disabling them from taking steps to counteract the effects of the Data Breach and to protect themselves.

---

[3] *Privacy Policy*, RUSSELL CELLULAR, https://russellcellular.com/privacy-policy/ (last visited June 11, 2026).

[4] Paulina Okunytė, *Verizon Opens Investigation into Stolen Customer Data Being Sold Online*, CYBERNEWS (Mar. 17, 2026), https://cybernews.com/security/russell-cellular-data-data-breach/.

12. After the customer data was posted for sale, Verizon acknowledged that it was aware of a "potential threat targeting customer data."[5]

13. Verizon did not begin notifying affected customers until about April 10, 2026. Verizon's email notice stated that, "[o]n or about March 17, 2026, Russell Cellular informed Verizon that an unauthorized third party accessed certain customer information including customer name, phone number, the name of the price plan and a device identifier known as an IMEI."[6]

14. Public reporting further indicates that the compromised information may have included full names, phone numbers, email addresses, account numbers, invoice and tracking numbers, device identifiers, contract details, selected tariff plans, and employee credentials and access roles.[7]

15. Defendants have not disclosed the full scope of the Data Breach, the vulnerabilities exploited, the complete categories of information compromised, the identities of the threat actors, or the remedial measures implemented to prevent a similar incident from occurring again.

16. The compromised information is particularly sensitive in the telecommunications context because phone numbers, account information, wireless plan information, and device identifiers can be used to facilitate phishing schemes, account-takeover attempts, SIM-swapping attacks, social-engineering schemes, unauthorized account access, and other forms of fraud.

17. But for Defendants' failure to implement and maintain reasonable and industry-standard cybersecurity practices necessary to protect the information entrusted to them, the Data Breach would not have occurred.

---

[5] *Id*.
[6] International Mobile Equipment Identity.
[7] Mark Jansen, *Hackers Put the Data of Over 6 Million Verizon Customers Up for Sale*, ANDROID POLICE (Mar. 23, 2026), https://www.androidpolice.com/63-million-verizon-customers-might-have-had-their-data-exposed/ (last visited Jun. 11, 2026).

18. Defendants knew or should have known that the information they collected and maintained was highly valuable to cybercriminals and that telecommunications providers and their authorized retailers are frequent targets of cyberattacks seeking customer information. Moreover, Verizon knew that disclosure of this sensitive information to a third-party hacker was a breach of the Privacy Agreement that it had with Plaintiffs, and Class Members.

19. Despite their knowledge of the sensitivity of the information they maintained and the foreseeable risks posed by inadequate cybersecurity measures, Defendant Russell Cellular failed to implement reasonable safeguards sufficient to protect Plaintiffs' and Class Members' information from unauthorized access and disclosure. Defendant Verizon failed to sufficiently ensure that Russell Cellular protected Plaintiffs' and Class' Members' PII.

20. As a direct and proximate result of the Data Breach, Plaintiffs and Class Members have suffered and will continue to suffer injury, including the unauthorized disclosure of their information, lost time, out-of-pocket expenses, diminution in the value of their PII, and a substantially increased risk of fraud, identity theft, account compromise, phishing attacks, SIM-swapping attacks, and other misuse of their information.

21. Plaintiffs, and Class Members also have a continuing interest in ensuring that their information, which upon information and belief remains in Russell Cellular's possession, is adequately protected from future unauthorized access, disclosure, and misuse.

22. Plaintiffs bring this action, individually and on behalf of a nationwide class and state subclasses, seeking damages, restitution, declaratory and injunctive relief, attorneys' fees and costs, and all other relief the Court deems just and proper.

## PARTIES

***Plaintiffs***

23. Plaintiff Jonathan Aguilar-Vazquez is, and at all times relevant hereto was, a resident and citizen of Wyoming, Michigan. He purchased both an iPhone and Verizon cellular service in person at a Russell Cellular store.

24. Plaintiff Adessa Consulting, Inc. ("Adessa") is a corporation organized and existing under the laws of the State of New York with its principal place of business in New York, New York. Adessa purchased both an iPhone, a Samsung cell phone and Verizon cellular service at a Russell Cellular store.

25. Plaintiff Tina Burns is, and, at all times relevant hereto was, a resident and citizen of Dublin, Texas. Plaintiff Burns purchased two iPhones, an iPad, a hotspot and Verizon cellular service in person at a Russell Cellular store.

***Defendants***

26. Defendant Russell Cellular is a Missouri corporation with its principal place of business located at 4125 Wilson Creek Marketplace Road, Battlefield, Missouri 65619.

27. Defendant Cellco Partnership d/b/a Verizon Wireless is a Delaware general partnership with its principal place of business located at One Verizon Way, Basking Ridge, New Jersey 07920. It is a wholly owned subsidiary of Verizon Communications, Inc.

## JURISDICTION AND VENUE

28. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds $5,000,000, exclusive of interest and costs; the proposed Class consists of more than 100 members; and

minimal diversity exists because at least one member of the proposed Class is a citizen of a state different from at least one Defendant.

29. This Court has personal jurisdiction over Defendant Russell Cellular because Defendant Russell Cellular is registered to do business in the State of Missouri; has its principal place of business in this District; conducts substantial business in this District through its headquarters, offices, and affiliates; engaged in the conduct at issue here in this District; and/or otherwise has substantial contacts with this District and purposefully availed itself of the privilege of conducting activities within this District.

30. This Court has specific personal jurisdiction over Defendant Verizon because a substantial part of the events, omissions, and conduct giving rise to Plaintiffs' claims occurred in this District. Defendant Verizon conducts substantial business in Missouri and this District through its wireless telecommunications operations and authorized retail network, including Defendant Russell Cellular, and the claims asserted herein arise out of and relate to those contacts.

31. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District. Upon information and belief, the Data Breach and the conduct giving rise to Plaintiffs' claims originated, at least in part, from activities occurring within this District.

## FACTUAL ALLEGATIONS

### I. Background

32. Russell Cellular was founded in 1993 to sell Alltel Wireless products.[8]

[8] *Our Story*, RUSSELL CELLULAR, https://russellcellular.com/our-story/ (last visited June 10, 2026).

33. The first Russell Cellular retail location opened in 1994, and by 2008, Russell Cellular operated retail locations in Missouri, Kansas, Arkansas, and Ohio.[9]

34. In 2009, Alltel Wireless was acquired by Verizon Wireless, and all Russell Cellular stores were converted to Verizon stores. As a result, Russell Cellular expanded its operations and became one of Verizon's largest authorized retailers.[10] Russell Cellular has a partnership with Verizon, but it not an agent of Verizon, and is an independent company.

35. Verizon is one of the largest wireless telecommunications providers in the United States and provides wireless telecommunications services to millions of customers nationwide through its direct operations and authorized retailers, including Russell Cellular.[11]

36. Upon information and belief, Verizon maintains, stores, transmits, and controls customer information associated with wireless accounts, devices, plans, and services offered through its network and authorized retail partners.

37. Russell Cellular is a Verizon authorized retailer that collects, stores, transmits, and maintains substantial amounts of customer information, including personal information, account information, device identifiers, and other sensitive data entrusted to it by Verizon customers.

38. Upon information and belief, the information compromised in the Data Breach consisted of information relating to Verizon customers, accounts, devices, and services that Russell Cellular collected and maintained in connection with its retail operations as a Verizon Authorized Retailer.

---

[9] *Id.*
[10] *Id.*
[11] *2025 Annual Report* (2026), VERIZON COMMC'NS INC. https://www.verizon.com/about/investors/annual-report.

39. Upon information and belief, Russell Cellular maintained the database and systems allegedly compromised in the Data Breach and was responsible for implementing and maintaining reasonable safeguards to protect the information entrusted to it.

40. Verizon utilized a nationwide network of authorized retailers, including Russell Cellular, to market and sell Verizon products and services and facilitate customer transactions involving Verizon accounts, devices, and services.

41. Verizon benefited from the collection, use, and maintenance of customer information obtained through its authorized retailer network, including information relating to Verizon customers and accounts.

42. Upon information and belief, Verizon maintained requirements and standards applicable to authorized retailers participating in Verizon's retail network, including requirements relating to the handling and protection of customer information associated with Verizon products and services.

43. Verizon knew or should have known that authorized retailers such as Russell Cellular maintained substantial quantities of sensitive customer information and that Russell Cellular's failure to implement reasonable cybersecurity measures would expose Verizon customers to a foreseeable risk of harm.

44. As part of their business operations, Defendants regularly collect and maintain sensitive personal, account, and business information belonging to millions of current and former Verizon customers. Consequently, Defendants knew or should have known that they were attractive targets for cybercriminals seeking to obtain valuable customer information for fraud, identity theft, account takeover schemes, phishing attacks, SIM-swapping attacks, and other unlawful purposes.

45. Given the volume and sensitivity of the information entrusted to them, Defendants understood the importance of implementing and maintaining reasonable cybersecurity measures, access controls, employee training, monitoring systems, and other safeguards designed to protect customer information from unauthorized access, disclosure, and exfiltration.

46. Russell Cellular's Privacy Policy states that "[o]ur website is scanned on a regular basis for security holes and known vulnerabilities in order to make your visit to our site as safe as possible."[12]

47. Russell Cellular further represents that it utilizes "regular Malware Scanning" and that personal information is contained behind secured networks and accessible only by a limited number of persons with special access rights who are required to keep such information confidential.[13]

48. Russell Cellular further represents that sensitive information supplied by customers is encrypted using Secure Socket Layer ("SSL") technology and that it implements a variety of security measures to maintain the safety of customer information.[14]

49. Verizon's Privacy Policy represents that it uses "technical, administrative and physical safeguards to help protect against unauthorized access to, use or disclosure of information" and that it trains employees regarding the importance of privacy and security and the proper handling of customer information.[15]

50. It further indicates that such personal information will only be used for limited purposes, such as delivering and maintaining products and services, billing and research, and that

---

[12] *Privacy Policy*, RUSSELL CELLULAR, https://russellcellular.com/privacy-policy/ (last visited June 10, 2026).
[13] *Id.*
[14] *Id.*
[15] *Privacy Policy*, VERIZON, https://www.verizon.com/about/privacy/ (last visited June 10, 2026).

such information will be disclosed or shared only with Verizon's affiliates and agents for limited purposes, such as providing information about its latest products and services and promotions. It does not provide that personal information will be shared with unauthorized third- parties.

51. At all relevant times, Defendants represented to customers that they maintained administrative, technical, and physical safeguards designed to protect customer information from unauthorized access and disclosure. Plaintiffs and Class Members reasonably relied upon those representations when providing their information to Defendants and continuing to do business with Defendants, and therefore trusted Defendants with their PII.

52. The information maintained by Russell Cellular and Verizon is particularly valuable to cybercriminals because it can be used to facilitate identity theft, account takeover attacks, phishing schemes, SIM-swapping attacks, unauthorized access to wireless accounts, and other forms of fraud.

53. The Data Breach is particularly concerning because the compromised information included IMEI numbers, which are unique device identifiers associated with specific mobile devices. IMEI numbers can reveal information about a device, including whether it is carrier-locked or has been reported lost or stolen, and may be used by unauthorized actors to facilitate account-compromise and social-engineering schemes.[16]

54. Unauthorized actors may also use IMEI numbers to facilitate device-cloning attacks by programming the same IMEI onto another device. Such activity can be used to support fraudulent conduct, including unauthorized access to telecommunications services, account-

[16] *What Can Someone Do with My IMEI Number? Risks and Protective Measures*, NSYS GRP. (Jan. 30, 2025), https://nsysgroup.com/blog/what-can-someone-do-with-my-imei-number/ (last visited June 10, 2026).

takeover attempts, and other unlawful activity, potentially resulting in service disruptions, blacklisting, or other harms to affected consumers.[17]

55. By collecting, storing, maintaining, transmitting, and otherwise benefiting from Plaintiffs' and Class Members' information, Russell Cellular assumed and owed duties to exercise reasonable care in safeguarding that information, to implement and maintain adequate security measures, to timely detect and respond to security incidents, and to protect such information from unauthorized access, disclosure, and exfiltration.

56. Verizon exercised oversight and control over its authorized retailer network, including Russell Cellular, and was responsible for ensuring reasonable safeguards for customer information maintained on its behalf and to ensure compliance with the Verizon Privacy Policy.

## II. The Data Breach

57. In or around March 2026, cybersecurity researchers, threat intelligence firms, and media outlets began reporting that a dataset purportedly associated with Russell Cellular was being offered for sale on dark web marketplaces. For example, one report noted that a "database allegedly belonging to Russell Cellular is now circulating on a well-known hacker forum" and being offered for sale by threat actors. Other reporting similarly described "a dataset allegedly containing more than 6.3 million customer records . . . is there being offered for sale online for $1,200."[18]

58. Thereafter, on or about March 17, 2026, threat actors publicly advertised a database for sale on criminal forums and the dark web, claiming that the dataset had been extracted from systems associated with Russell Cellular and contained sensitive customer and account

---

[17] *Id.*

[18] TEISS, *Hackers Claim 6.3 Million Customer Records Stolen from Verizon Retail Partner Russell Cellular* (Mar. 2026), https://www.teiss.co.uk/news/hackers-claim-63-million-customer-records-stolen-from-verizon-retail-partner-russell-cellular-17247.

information.[19] The threat actors represented that the dataset consisted of approximately 61 gigabytes of data and included records relating to approximately 6.3 million individuals.[20]

59. According to public reporting, the dataset included detailed customer information such as names, phone numbers, email addresses, account information, invoice and tracking numbers, device identifiers, contract information, selected wireless plans, and employee credentials and access roles. Security researchers reported that samples of the dataset appeared authentic and contained detailed customer account information, lending credibility to the claim that the data originated from a non-public database associated with Russell Cellular or systems used in connection with Verizon wireless services.[21]

60. Following publication of the threat actor's claims, Verizon acknowledged the incident. Public reporting indicated that Verizon informed media outlets that it was aware of a "potential threat targeting customer data" involving a third-party retailer and was investigating the matter.[22] Russell Cellular has not taken steps to notify customers.

61. Despite learning of the incident on or about March 17, 2026, Verizon did not begin notifying affected individuals until on or around April 10, 2026. In those notices, Verizon disclosed that "Russell Cellular informed Verizon that an unauthorized third party accessed certain customer information including customer name, phone number, the name of the price plan and a device identifier known as an IMEI."[23]

---

[19] BRINZTECH, *Breach Alert: 6.3 Million Customer Records of Russell Cellular on Sale* (Mar. 2026), https://www.brinztech.com/breach-alerts/brinztech-alert-6-3-million-customer-records-of-russell-cellular-on-sale/.
[20] *Id.*
[21] Paulina Okunytė, *Verizon opens investigation into stolen customer data being sold online*, CYBERNEWS (Mar. 17, 2026), https://cybernews.com/security/russell-cellular-data-data-breach/ (last visited June 10, 2026).
[22] *Id.*
[23] *See* Exhibit A.

62. Through the Data Breach, unauthorized actors gained access to highly sensitive personal, account, and business information belonging to Plaintiffs and Class Members.

63. The information exposed in the Data Breach is particularly valuable to cybercriminals in the telecommunications context because it can be used to facilitate phishing attacks, account-takeover attempts, SIM-swapping attacks, social-engineering schemes, unauthorized account access, and other forms of fraud. The inclusion of phone numbers, account information, and device identifiers materially increases the risk that affected individuals and entities will be targeted for such attacks.

64. Upon information and belief, Defendants have not notified all required governmental authorities, including applicable state attorneys general, regarding the full scope of the Data Breach.

65. Verizon's notices fail to disclose critical facts necessary for Plaintiffs and Class Members to fully assess the risks associated with the Data Breach, including, *inter alia*: (a) when the unauthorized access began; (b) how long the unauthorized access existed; (c) the full categories of information compromised; (d) the total number of affected individuals and entities; (e) the specific vulnerabilities or security failures that permitted the intrusion; (f) the identity of the threat actors, if known; and (g) the remedial measures implemented to prevent similar incidents from occurring in the future.

66. Defendants have likewise failed to publicly disclose the root cause of the Data Breach, the precise manner in which Russell Cellular's systems were compromised, or whether the accessed information was downloaded, exfiltrated, disseminated, or otherwise misused by unauthorized parties.

67. Without this information, Plaintiffs, Class and Subclass Members cannot accurately evaluate their risk exposure or take fully informed measures to protect themselves from fraud, identity theft, account compromise, SIM-swapping attacks, phishing campaigns, and other foreseeable misuse of their information.

68. Defendants have offered no meaningful compensation to affected individuals and entities and have failed to provide adequate mitigation services commensurate with the scope of the Data Breach and the sensitivity of the information compromised. Defendants' response is woefully inadequate given the ongoing and heightened risk of fraud, identity theft, account compromise, phishing attacks, and other harms that Plaintiffs and Class Members now face as a result of the Data Breach.

## III. The Data Breach was Preventable

69. At all relevant times, Defendants knew or should have known that the PII entrusted to them was highly valuable to cybercriminals and constituted a prime target for theft. Defendants collected, maintained, and stored large volumes of sensitive customer information, including names, phone numbers, account information, wireless plan information, and device identifiers, the compromise of which foreseeably could result in fraud, identity theft, account takeover attacks, phishing schemes, SIM-swapping attacks, and other forms of misuse.

70. As custodians of Plaintiffs', and Class Members' PII, Russell Cellular had a duty to implement and maintain reasonable administrative, technical, and physical safeguards to protect that information from unauthorized access, disclosure, and exfiltration. Verizon had a duty to oversee Russell Cellular and its proper maintenance of Verizon customers' PII, particularly in light of its Privacy Policy that limits the sharing of such data with third parties.

71. Defendants knew or should have known that the failure to employ adequate cybersecurity measures would expose Plaintiffs and Class Members to a substantial risk of harm.

72. The risks associated with cyberattacks against telecommunications providers, wireless carriers, and their authorized retailers have been widely known for years. Indeed, customer account information, phone numbers, device identifiers, and related telecommunications data are particularly attractive to cybercriminals because they can be used to facilitate account-takeover attacks, SIM-swapping attacks, social-engineering schemes, phishing campaigns, and other fraudulent activity.

73. Defendants publicly represented that they employed security measures designed to protect customer information, including secure networks, malware scanning, encryption technologies, and administrative, technical, and physical safeguards. Nevertheless, the Data Breach demonstrates that Defendants failed to implement, maintain, monitor, or enforce, and/or failed to oversee implementation, of reasonable cybersecurity practices sufficient to prevent unauthorized access to Plaintiffs' and Class Members' PII.[24]

74. Upon information and belief, Defendants failed to adequately assess foreseeable cybersecurity risks; failed to implement appropriate access controls, monitoring systems, and intrusion-detection measures; failed to adequately train and supervise employees and agents responsible for information security; failed to timely detect and respond to unauthorized access; and otherwise failed to employ reasonable cybersecurity measures commensurate with the sensitivity and volume of the PII in their possession.

---

[24] *Privacy Policy*, RUSSELL CELLULAR, https://russellcellular.com/privacy-policy/ (last visited June 10, 2026); *Privacy Policy*, Verizon, https://www.verizon.com/about/privacy/ (last visited June 10, 2026).

75. The scope of the Data Breach further demonstrates the inadequacy of Russell Cellular's security practices. According to public reporting, threat actors obtained access to a database allegedly containing approximately 61 gigabytes of data relating to approximately 6.3 million individuals and offered that information for sale on criminal marketplaces.[25] Such a large-scale compromise would not have occurred absent deficiencies in Defendants' data-security practices, systems, monitoring, and the absence of Verizon's oversight.

76. Had Defendants implemented reasonable cybersecurity measures, complied with industry standards, adequately monitored their systems, and timely identified and remediated security vulnerabilities, the Data Breach would have been prevented or significantly mitigated.

## IV. Defendants Failed to Comply with FTC Guidance

77. At all relevant times, Defendants knew or should have known the importance of safeguarding the personal, account, business, and device information entrusted to them and the foreseeable consequences of failing to do so. Defendants collected, stored, and maintained sensitive information or oversaw the collection of sensitive information relating to millions of customers and knew that unauthorized access to such information would expose affected individuals and entities to a substantial risk of fraud, identity theft, account compromise, phishing attacks, SIM-swapping attacks, and other harms.

78. The Federal Trade Commission ("FTC") has long recognized the importance of implementing reasonable data-security measures to protect sensitive consumer information and has repeatedly advised businesses that collect and maintain such information to implement appropriate administrative, technical, and physical safeguards.

[25] Okunytė, *supra* note 21.

79. In its publication, *Protecting Personal Information: A Guide for Business*, the FTC identifies fundamental security practices for businesses that collect and maintain sensitive information, including: (a) identifying reasonably foreseeable internal and external risks to customer information; (b) implementing safeguards to control such risks; (c) encrypting sensitive information where appropriate; (d) restricting access to sensitive information; (e) monitoring systems for unauthorized access and suspicious activity; and (f) maintaining procedures to detect, respond to, and recover from security incidents.[26]

80. The FTC has further advised businesses to maintain intrusion-detection capabilities, monitor networks for unusual activity and unauthorized data transfers, regularly assess vulnerabilities, train employees regarding cybersecurity risks, and oversee service providers that have access to customer information.

81. Defendants knew or should have known of these well-established FTC principles and their obligation to implement reasonable safeguards to protect Plaintiffs' andClass Members' information. Nevertheless, Defendants failed to implement reasonable measures sufficient to protect the information entrusted to them from unauthorized access, disclosure, and exfiltration, or to sufficiently oversee the protection of such information.

82. Businesses that fail to employ reasonable measures to protect sensitive consumer information may be subject to enforcement actions under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

---

[26] *See Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited June 30, 2025).

83. Many states' consumer-protection and unfair-and-deceptive-trade-practices statutes are modeled after, or interpreted consistently with, Section 5 of the FTC Act. Defendants' failure to implement reasonable safeguards and protect Plaintiffs' and Class Members' information therefore constitutes unfair, unlawful, and deceptive conduct under those statutes.

84. After learning of the Data Breach, Defendants failed to act with reasonable speed and transparency in investigating the incident, notifying affected individuals, disclosing material facts regarding the breach, and providing meaningful assistance to victims seeking to mitigate the resulting harms.

## V. Defendants Failed to Comply with Industry Standard Data Security Practices

85. At all relevant times, industry standards require organizations that collect, store, and maintain sensitive customer information to implement reasonable administrative, technical, and physical safeguards designed to protect such information from unauthorized access, disclosure, and exfiltration.

86. Such safeguards commonly include, *inter alia*, maintaining secure network architecture; implementing appropriate access controls; restricting access to sensitive information on a need-to-know basis; monitoring networks and systems for suspicious activity; detecting and responding to unauthorized access attempts; encrypting sensitive information where appropriate; maintaining intrusion-detection and intrusion-prevention capabilities; regularly assessing vulnerabilities; and training employees regarding cybersecurity risks and information-security practices.

87. Industry-standard cybersecurity practices also require organizations to monitor for unusual network activity, investigate indications of unauthorized access, maintain incident-response procedures, oversee third-party service providers with access to sensitive information,

and implement controls designed to prevent the unauthorized acquisition, disclosure, or exfiltration of customer information.

88. Upon information and belief, Russell Cellular failed to adequately assess foreseeable cybersecurity risks, failed to implement reasonable monitoring and access-control measures, failed to timely detect and respond to unauthorized access, failed to adequately train and supervise personnel responsible for information security, and otherwise failed to employ security practices commensurate with the volume and sensitivity of the information in their possession.

89. Russell Cellular also failed to comply with widely recognized cybersecurity frameworks and guidance, including the National Institute of Standards and Technology ("NIST") Cybersecurity Framework and the Center for Internet Security ("CIS") Critical Security Controls, both of which identify fundamental security practices for protecting sensitive information and detecting, preventing, and responding to cybersecurity incidents.[27]

90. Verizon failed to adequately oversee Russell Cellular's maintenance of the sensitive personal information of its customers, and to take steps to comply with its Privacy Policy.

91. The Data Breach demonstrates that Defendants failed to implement, maintain, monitor, and enforce reasonable cybersecurity measures consistent with industry standards and widely accepted security frameworks, thereby allowing unauthorized actors to access and compromise Plaintiffs' and Class' Members' information.

---

[27], *Cybersecurity Framework (CSF) 2.0*, NAT'L INST. OF STANDARDS AND TECH., https://www.nist.gov/cyberframework (last visited June 10, 2026); *CIS Critical Security Controls*, CENTER FOR INTERNET SECURITY, https://www.cisecurity.org/controls (last visited June 10, 2026).

## VI. Plaintiffs' and Class Members' Experiences.

**Plaintiff Aguilar-Vazquez**

92. Plaintiff Aguilar-Vazquez received notice of the Data Breach from Defendant Verizon on or around April 10, 2026, informing him that his sensitive information— "customer name, phone number, the name of the price plan and a device identifier known as an IMEI"—may have been part of the Data Breach.[28]

93. Prior to the Data Breach, Plaintiff Aguilar-Vazquez took reasonable precautions to protect his personal information.

94. Plaintiff Aguilar-Vazquez provided Russell Cellular with sensitive personal information and cannot be certain how much of that information was exfiltrated.

95. As a result of the Data Breach, Plaintiff Aguilar-Vazquez has spent time assessing the impact of the Data Breach, monitoring his accounts, reviewing available identity theft and credit monitoring protections, and taking steps to mitigate the risk of fraud and misuse of his personal information.

96. Plaintiff Aguilar-Vazquez has observed a significant uptick in spam text messages and calls since the Data Breach.

97. Plaintiff Aguilar-Vazquez suffered an actual injury in the form of damages and diminution in the value of his PII, as well as lost time, annoyance, interference, inconvenience, and lost opportunity costs resulting from the Data Breach.

98. Plaintiff Aguilar-Vazquez faces a present and continuing risk of fraud, identity theft, unauthorized account access, phishing attacks, and misuse of his personal information.

---

[28] *See* Exhibit A.

99. Plaintiff Aguilar-Vazquez anticipates spending considerable time and effort on an ongoing basis to mitigate and address harms caused by the Data Breach.

100. Plaintiff Aguilar-Vazquez has a continuing interest in ensuring that his PII, which upon information and belief remains in Defendants' possession, is protected and safeguarded from future breaches.

**Plaintiff Adessa Consulting, Inc.**

101. Plaintiff Adessa purchased goods and services through Russell Cellular in late 2025. Prior to the Data Breach, Plaintiff Adessa took reasonable precautions to protect its sensitive business information. Plaintiff Adessa has never knowingly transmitted unencrypted sensitive information over the internet or any other unsecured source.

102. Plaintiff Adessa provided Defendants with sensitive business, and account information and cannot be certain how much of that information was exfiltrated.

103. As a result of the Data Breach, Plaintiff Adessa has spent time assessing the impact of the Data Breach, monitoring its financial and business accounts, reviewing available identity theft and fraud protections, and taking steps to mitigate the risk of fraud and misuse of its information. Plaintiff Adessa has spent significant time on mitigation activities in response to the Data Breach.

104. Plaintiff Adessa has experienced a significant uptick in spam calls since the Data Breach.

105. Plaintiff Adessa suffered an actual injury in the form of damages and diminution in the value of its information, as well as lost time, annoyance, interference, inconvenience, and lost opportunity costs resulting from the Data Breach.

106. Plaintiff Adessa faces a present and continuing risk of fraud, unauthorized account access, SIM-swapping attacks, phishing schemes, and misuse of its information.

107. Plaintiff Adessa anticipates spending considerable time and money on an ongoing basis to mitigate and address harms caused by the Data Breach.

108. Plaintiff Adessa has a continuing interest in ensuring that its information, which upon information and belief remains in Defendants' possession, is protected and safeguarded from future breaches.

**Plaintiff Tina Burns**

109. Plaintiff Burns received notice of the Data Breach from Defendant Verizon on or around April 10, 2026, informing her that her sensitive information, "customer name, phone number, the name of the price plan and a device identifier known as an IMEI," may have been part of Defendants' Data Breach.

110. Prior to the Data Breach, Plaintiff Burns took reasonable precautions to protect her personal information.

111. Plaintiff Burns provided Defendants with sensitive personal information and cannot be certain how much of that information was exfiltrated.

112. As a result of the Data Breach, Plaintiff Burns has spent time assessing the impact of the Data Breach, monitoring her accounts, reviewing available identity theft and credit monitoring protections, and taking steps to mitigate the risk of fraud and misuse of her personal information.

113. Plaintiff Burns suffered an actual injury in the form of damages and diminution in the value of her PII, as well as lost time, annoyance, interference, inconvenience, and lost opportunity costs resulting from the Data Breach.

114. Plaintiff Burns faces a present and continuing risk of fraud, identity theft, unauthorized account access, phishing attacks, and misuse of her personal information.

115. Plaintiff Burns anticipates spending considerable time and effort on an ongoing basis to mitigate and address harms caused by the Data Breach.

116. Plaintiff Burns has a continuing interest in ensuring that her PII, which upon information and belief remains in Defendants' possession, is protected and safeguarded from future breaches.

## VII. Defendants Breached Their Obligations to Plaintiffs and the Class

117. Defendants have failed to offer meaningful compensation to victims of the Data Breach, who face years of heightened risk of fraud, identity theft, account compromise, phishing attacks, SIM-swapping attacks, and other misuse of their personal and business information. Defendants have likewise failed to compensate Plaintiffs and Class Members for the unauthorized disclosure of their information, their out-of-pocket expenses, lost opportunity costs, and the substantial time and effort required to mitigate the consequences of the Data Breach.

118. Plaintiffs and Class Members have been damaged by the compromise, exfiltration, and unauthorized disclosure of their PII and by the severe disruption to their lives and business affairs that foreseeably resulted from the Data Breach.

119. Upon information and belief, Plaintiffs' and Class Members' information was acquired by cybercriminals and was offered for sale or otherwise disseminated to unauthorized third parties, thereby increasing the risk of future misuse for years to come.

120. As a direct and proximate consequence of Defendants' conduct, Plaintiffs and Class Members have been placed at an imminent, substantial, and ongoing risk of fraud, identity theft,

account takeover, unauthorized account access, phishing attacks, SIM-swapping attacks, and other forms of misuse of their PII.

121. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have expended and will continue to expend—significant time and resources assessing the impact of the Data Breach, monitoring accounts, reviewing financial and credit information, implementing protective measures, and mitigating the risk of fraud and misuse.

122. Plaintiffs and Class Members have suffered and will continue to suffer actual injuries, including diminution in the value of their personal and business information, lost time, lost opportunity costs, out-of-pocket expenses, and the ongoing costs associated with monitoring, protecting, and securing their PII. Plaintiffs and Class Members also face a substantial risk of future fraud losses, unauthorized account activity, account compromise, phishing attacks, SIM-swapping attacks, identity theft, and other forms of fraud and misuse.

123. Plaintiffs and Class Members face a substantial and continuing risk of being targeted for future phishing schemes, social-engineering attacks, account-takeover attempts, and other unlawful activity because cybercriminals can use the compromised information to more effectively target Plaintiffs and Class Members.

124. Plaintiffs and Class Members suffered a loss of value in their PII when that information was compromised, exfiltrated, and acquired by unauthorized parties. PII has measurable value, and Defendants' failure to adequately safeguard that information diminished that value.

125. Many Class Members, including Plaintiffs, have suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach, including:

a) Monitoring financial, business, and other accounts for suspicious or unauthorized activity;

b) Reviewing credit reports and other records for evidence of identity theft, fraud, or misuse of their information;

c) Purchasing or maintaining credit monitoring, fraud protection, identity theft protection, and similar services;

d) Placing fraud alerts, security freezes, or other protective measures with credit reporting agencies and financial institutions;

e) Communicating with financial institutions, credit bureaus, telecommunications providers, and other third parties regarding actual or potential misuse of their information;

f) Investigating suspicious activity, fraudulent charges, unauthorized account access, or attempted account takeovers;

g) Securing, modifying, or replacing compromised account credentials and authentication information; and

h. Spending substantial time assessing the impact of the Data Breach and implementing measures to protect against future misuse of their information.

126. Moreover, Plaintiffs and Class Members have a continuing interest in ensuring that their PII, which upon information and belief remains in Defendants' possession, is adequately protected through the implementation of reasonable data-security measures, safeguards, monitoring, employee training, access controls, and other security practices designed to prevent future breaches.

## CLASS ACTION ALLEGATIONS

127. Plaintiffs bring this class action on behalf of themselves and all other similarly situated individuals under Federal Rule of Civil Procedure 23 on behalf of the following Nationwide Class and State Subclasses ("Subclasses") (together, the "Class"):

> **Nationwide Class:** All persons and entities residing in the United States whose PII was accessed, acquired, compromised, disclosed, exfiltrated, or otherwise affected as a result of the Data Breach, and who suffered damages.
>
> **New York Subclass:** All persons and entities residing in New York whose PII was accessed, acquired, compromised, disclosed, exfiltrated, or otherwise affected as a result of the Data Breach, and who suffered damages.
>
> **Texas Subclass:** All persons and entities residing in Texas whose PII was accessed, acquired, compromised, disclosed, exfiltrated, or otherwise affected as a result of the Data Breach, and who suffered damages.
>
> **Michigan Subclass:** All persons and entities residing in Michigan whose PII was accessed, acquired, compromised, disclosed, exfiltrated, or otherwise affected as a result of the Data Breach, and who suffered damages.

128. Plaintiffs reserve the right to amend or modify the foregoing Class and Subclass definitions and to seek certification of additional or alternative classes or subclasses as appropriate based upon discovery and further investigation.

129. Excluded from the Class and Subclasses are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, coconspirators, successors, subsidiaries, and assigns. Also excluded from the Class and Subclasses are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

130. This action satisfies the requirements of Federal Rule of Civil Procedure 23 with respect to the Class and Subclasses, including numerosity, commonality, typicality, adequacy, predominance, and superiority.

131. **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. Plaintiffs estimates that the Class is comprised of over six million Class Members. The Subclasses are likewise so numerous that joinder of all members is impracticable. The Class is sufficiently numerous to warrant certification.

132. **Commonality.** Common legal and factual questions exist that predominate over any questions affecting only individual Class and Subclass Members. These common questions, which do not vary among Class and Subclass Members, and which may be determined without reference to any Class and Subclass Member's individual circumstances, include, but are not limited to:

a) Whether Defendants failed to take adequate and reasonable measures to ensure their websites and data systems were protected and/or whether Verizon failed to oversee the institution of adequate and reasonable measures by Russell Cellular;

b) Whether Defendants failed to take available steps to prevent and stop the breach from happening or mitigating the risk of a long-term breach and/or to oversee measures that would have prevented the Data Breach;

c) Whether Verizon unreasonably delayed in notifying Plaintiffs and Class Members of the harm they suffered once the suspicious activity was detected, and whether Russell Cellular was obligated to notify Plaintiffs and Class Members and failed to do so;

d) Whether Defendants owed a legal duty to Plaintiffs and Class Members to protect their PII;

e) Whether Defendants breached any duty to protect the personal information of Plaintiffs and Class Members by failing to exercise due care in protecting their PII;

f) Whether Defendants breached their implied or actual contractual duties to Plaintiffs and Class Members;

g) Whether Defendants took sufficient steps to secure Class Members' PII;

h) Whether Defendants were unjustly enriched;

i) Whether Plaintiffs and Class Members are entitled to actual, statutory, contractual or other forms of damages and other monetary relief;

j) Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief or restitution;

k) Whether Defendants adequately safeguarded customer account information, device identifiers, and related telecommunications data;

l) Whether Defendants failed to implement reasonable cybersecurity measures to prevent unauthorized access, exfiltration, and dissemination of Class Members' information; and

m) Whether Defendants' notice and response to the Data Breach, or failure to send notice, was reasonable and timely.

133. **Typicality.** Plaintiffs' claims are typical of the claims of the Class and the respective Subclasses they seek to represent because Plaintiffs and Class Members were subjected to the same conduct, their information was compromised in the same Data Breach, and they suffered similar injuries arising from Defendants' failure to adequately safeguard their PII.

134. **Adequacy of Representation.** Plaintiffs are adequate class representatives of the Class and their respective Subclasses because they are members of the Class and Subclasses they seek to represent, and their interests do not conflict with the other Class or Subclass Members. Plaintiffs retained counsel who are competent and experienced in class action and data breach litigation. Plaintiffs and their counsel intend to prosecute this action vigorously for the Class and Subclasses' benefit and will fairly and adequately protect their interests.

135. **Predominance and Superiority.** The Class and Subclasses can be properly maintained because the above common questions of law and fact predominate over any questions affecting individual Class or and Subclass Members. A class action is also superior to other available methods for the fair and efficient adjudication of this litigation because individual litigation of each Class and Subclass Member's claim is impracticable. Even if each Class Member could afford individual litigation, the court system could not. It would be unduly burdensome if thousands of individual cases proceeded. Individual litigation also presents the potential for inconsistent or contradictory judgments, the prospect of a race to the courthouse, and the risk of an inequitable allocation of recovery among those with equally meritorious claims. Individual litigation would increase the expense and delay to all parties and the courts because it requires individual resolution of common legal and factual questions. By contrast, the class-action device presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

136. **Declaratory and Injunctive Relief.** The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendants. Such individual actions would create a risk of adjudications that would be dispositive

of the interests of other Class Members and impair their interests. Defendants have acted and/or refused to act on grounds generally applicable to the Class, making final injunctive relief or corresponding declaratory relief appropriate. Moreover, Russell Cellular continues to maintain Plaintiffs' and the Class PII so that injunctive relief requiring Defendants to institute adequate measures to safeguard that information is necessary, and unless and until that is required, Plaintiffs', and Class Members' PII remains at risk of being subject to future data breaches and hacks.

## CLAIMS FOR RELIEF

### Count 1
### Negligence
### (Against All Defendants)
### (On behalf of Plaintiffs and the Nationwide Class)

137. Plaintiffs, individually and on behalf of the Class Members, incorporate by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

138. Plaintiffs and Class Members entrusted their PII to Defendants with the understanding that Defendants would safeguard their PII.

139. Defendants had full knowledge of the sensitivity of the PII that they stored and the types of harm that Plaintiffs and Class Members could and would suffer if that PII were wrongfully disclosed.

140. Russell Cellular violated its duty to implement and maintain reasonable security procedures and practices. That duty includes, among other things, designing, maintaining, and testing its information security controls sufficiently rigorously to ensure that PII in its possession was adequately secured by, for example, encrypting sensitive personal information, installing effective intrusion detection systems and monitoring mechanisms, using access controls to limit

access to sensitive data, regularly testing for security weaknesses and failures, timely detecting and responding to unauthorized access, and providing prompt and complete notice to affected individuals following a data-security incident. Verizon had a duty to oversee Russell Cellular's implementation and maintenance of reasonable security procedures and practices.

141. Defendants' duty of care arose from, among other things,

a) The special relationship between Defendants, Plaintiffs, and Class Members resulting from Plaintiffs and Class Members entrusting Defendants with confidential PII;

b) Defendants' exclusive ability (and Class Members' inability) to ensure that their systems, websites, and vendor services were sufficient to protect against the foreseeable risk that a data breach could occur;

c) Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, failing to adopt reasonable data security measures; and

d) Defendants' common law duties to adopt reasonable data security measures to protect PII under their possession and to act under the same or similar circumstances as a reasonable and prudent person would act.

142. Plaintiffs and Class Members were the foreseeable victims of Russell Cellular's inadequate data security and/or Verizon's failure to oversee the data security measures of Russell Cellular. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches. Defendants knew that a breach of their systems could and would cause harm to Plaintiffs and Class Members.

143. Defendants' conduct created a foreseeable risk of harm to Plaintiffs and Class Members. Defendants' conduct included their failure to adequately mitigate harm through negligently failing to timely disclose the nature and scope of the Data Breach and the categories of information compromised.

144. Defendants knew or should have known of the inherent risks in collecting and storing massive amounts of PII and the importance of limiting disclosure of that PII.

145. Defendants, through their actions and inactions, breached their duty owed to Plaintiffs and Class Members by failing to exercise reasonable care in safeguarding their PII while it was in their possession and control. Defendants breached their duty by, among other things, their failure to adopt reasonable data security practices and their failure to adopt reasonable security and notification practices, failure to monitor the security of their networks and systems and those of their partners, and allowing unauthorized access to Plaintiffs' and Class Members' PII.

146. Defendants inadequately safeguarded PII in breach of standard industry rules, regulations, and best practices at the time of the Data Breach.

147. But for Defendants' breach of their duty to adequately protect Class Members' PII, Class Members' PII would not have been stolen.

148. There is a temporal and close causal connection between Russell Cellular's failure to implement adequate data security measures and notification practices, the Data Breach/unauthorized disclosure, and the harms suffered by Plaintiffs and Class Members. There is also a close causal connection between Verizon's failure to oversee Russell Cellular's actions and the Data Breach/unauthorized disclosure.

149. As a result of Defendants' failure to timely notify Plaintiffs and Class Members that their PII had been compromised, or in the case of Russell Cellular, its complete failure to send

notice, Plaintiffs and Class Members are unable to take the necessary precautions to mitigate damages by preventing future fraud.

150. As a direct and traceable result of Defendants' negligence, Plaintiffs and Class Members suffered and will continue to suffer damages, including monetary damages, increased risk of future harm, loss of time and costs associated with the prevention, detection, and recovery from unauthorized use of their personal information; the continued risk to their personal information; future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the personal information compromised as a result of the Data Breach, overpayment for the services and products that were received without adequate data security; and embarrassment, humiliation, and emotional distress.

151. Plaintiffs and Class Members are entitled to all forms of monetary compensation set forth herein, including monetary payments to provide adequate identity protection services. Plaintiffs and Class Members are also entitled to the injunctive relief sought herein.

152. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

153. Plaintiffs also seek such other relief as the Court may deem just and proper.

**Count 2**
**Negligence *Per Se***
**(Against All Defendants)**
**(On behalf of Plaintiffs and the Nationwide Class)**

154. Plaintiffs, individually and on behalf of the Class, incorporate by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

155. Section 5 of the FTC Act, 15 U.S.C. § 45 prohibits, "unfair. . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by Defendants of failing to use reasonable measures to protect Plaintiffs' and Class Members' PII.

156. Russell Cellular violated duties imposed by Section 5 of the FTC Act and analogous state consumer-protection statutes by failing to employ reasonable measures to protect Plaintiffs' and Class Members' PII and by failing to comply with applicable data-security standards, and/or in the case of Verizon, failing to oversee Russell Cellular.

157. Defendants' conduct was particularly unreasonable given the nature and amount of PII obtained and stored and the foreseeable consequences of a data breach on Defendants' systems. Plaintiffs and Class Members were required to provide PII to Defendants in order to obtain wireless products and services.

158. Class Members are within the class of persons Section 5 of the FTC Act (and similar state statutes) was intended to protect.

159. Moreover, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) were intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and Class Members.

160. Defendants' failure to comply with applicable laws and regulations constitutes negligence *per se*.

161. But for Defendants' wrongful and negligent breach of their duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

162. The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they failed to meet their duties, and that Defendants' breach would cause Plaintiffs and Class Members to experience the foreseeable harms associated with the exposure of their PII.

163. As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class Members have suffered injury including, but not limited to: damages arising from identity theft and fraud; out-of-pocket expenses associated with procuring identity protection and restoration services; increased risk of future identity theft and fraud, and the costs associated therewith; and time spent monitoring, addressing, and correcting the current and future consequences of the Data Breach.

164. Plaintiffs and Class Members are therefore entitled to compensatory, consequential, nominal, and punitive damages in an amount to be proven at trial.

**Count 3**
**Breach of Implied Contract**
**(Against Defendant Russell Cellular, Inc.)**
**(On behalf of Plaintiffs and the Nationwide Class)**

165. Plaintiffs, individually and on behalf of the Class, incorporate by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

166. Plaintiffs and Class Members obtained wireless products and/or services from Russell Cellular and, in connection with those transactions and relationships, provided and entrusted their PII to Russell Cellular as part of its regular business practices.

167. By accepting Plaintiffs' and Class Members' PII, Russell Cellular entered into implied contracts with Plaintiffs and Class Members under which it explicitly stated and agreed to use reasonable measures to safeguard and protect that information, maintain its confidentiality, use

it only for authorized business purposes, and provide timely and accurate notice in the event of unauthorized access, disclosure, or compromise.

168. Pursuant to these implied contracts, Plaintiffs and Class Members provided Russell Cellular with their PII. In exchange, Russell Cellular agreed to, among other things, and Plaintiffs and the Class understood that Russell Cellular would: (1) provide services to Plaintiffs and Class Members; (2) take reasonable measures to protect the security and confidentiality of Plaintiffs' and Class Members' PII; and (3) protect Plaintiffs' and Class Members' PII in compliance with federal and state laws and regulations and industry standards.

169. Implied in these exchanges was a promise by Russell Cellular to ensure the PII of Plaintiffs and Class Members in their possession was only used to provide the agreed-upon reasons, and that Russell Cellular would take adequate measures to protect Plaintiffs' and Class Members' PII.

170. A material term of this contract is a covenant by Russell Cellular that it would take reasonable efforts to safeguard that information. Russell Cellular breached this covenant by allowing Plaintiffs' and Class Members' PII to be accessed in the Data Breach.

171. Indeed, implicit in the agreement between Russell Cellular and Plaintiffs and Class Members, was Russell Cellular's obligation to: (1) use such PII for business purposes only, (2) take reasonable measures to protect the security and confidentiality of Plaintiffs' and Class Members' PII, (3) prevent unauthorized disclosures of the PII, and (4) retain PII only under conditions that kept such information secure and confidential.

172. These exchanges constituted an agreement and meeting of the minds between the parties.

173. When the parties entered into an agreement, mutual assent occurred. Plaintiffs and Class Members provided their PII to Russell Cellular with the reasonable expectation that it would maintain data-security practices consistent with applicable law, industry standards, Russell Cellular's explicit representations concerning its data security measures, and the sensitive nature of the information collected.

174. Plaintiffs and Class Members would not have provided and entrusted their PII to Russell Cellular or would not have done so on the same terms, had they known it would fail to implement reasonable data-security measures or fail to provide timely and accurate notice of unauthorized access. Conversely, Russell Cellular presumably would not have taken Plaintiffs' and Class Members' PII if it did not intend to provide Plaintiffs and Class Members with its services.

175. Russell Cellular was therefore required to reasonably safeguard and protect the PII of Plaintiffs and Class Members from unauthorized disclosure and use.

176. Plaintiffs and Class Members fully performed their obligations under the implied contracts with Russell Cellular by providing their PII and paying for wireless products and/or services.

177. Russell Cellular breached its implied contracts with Plaintiffs and Class Members by failing to use reasonable measures to safeguard and protect their PII, failing to maintain adequate data-security practices, failing to comply with industry standards, failing to comply with the legal obligations necessarily incorporated into the implied contracts, failing to prevent unauthorized access to and disclosure of their PII, and failing to provide timely and accurate notice concerning the nature and scope of the Data Breach.

178. Russell Cellular's failure to implement adequate measures to protect the PII of Plaintiffs and Class Members violated the purpose of the agreement between the parties.

179. As a direct and proximate result of Russell Cellular's breach of implied contract, Plaintiffs and Class Members have suffered and will continue to suffer injuries, including unauthorized disclosure of their PII, loss of the confidentiality and value of their PII, lost time, lost opportunity costs, out-of-pocket expenses, increased risk of fraud and identity theft, account compromise, phishing attacks, SIM-swapping attacks, and other misuse of their information.

180. Plaintiffs and Class and Subclass Members are entitled to damages and all other relief available by law.

181. Plaintiffs also seek such other relief as the Court deems just and proper.

**Count 4**
**Breach of Express Contract**
**(Against Defendant Verizon for Violation of its Privacy Policy)**
**(On behalf of Plaintiffs and the Nationwide Class)**

182. Plaintiffs, individually and on behalf of the Class, incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

183. At all relevant times, Plaintiffs and Class Members entered into valid and enforceable Privacy Policy contracts with Verizon for wireless telecommunications products and services.

184. The terms of the Privacy Policy formed a part of the contract between Verizon and Plaintiffs and Verizon and each Class Member. By virtue of the Privacy Policy, Verizon owed a contractual duty to Plaintiffs and the other Class Members to honor its pledges and assurances in the Privacy Polices.

185. Verizon's contractual relationship with Plaintiffs and Class Members under the Privacy Policy included express promises, representations, obligations, and undertakings

concerning the collection, use, disclosure, privacy, confidentiality, sharing and protection of customer information and that such information would be shared with a limited number of persons for limited purposes.

186. In the Privacy Policy, Verizon expressly represented that it uses "technical, administrative and physical safeguards" designed to help protect customer information from unauthorized access, use, and disclosure and that it trains employees regarding the importance of privacy and security and the proper handling of customer information.

187. In the Privacy Policy, Verizon further represented that it maintained security measures designed to safeguard customer information and that it employed reasonable measures to protect customer information entrusted to it in connection with wireless products and services.

188. Verizon's promises concerning the privacy, confidentiality, sharing and security of customer information were material terms of its contractual relationships with Plaintiffs and Class Members and were intended to induce customers to provide sensitive information and purchase Verizon products and services.

189. In connection with obtaining and maintaining those products and services, Plaintiffs and Class Members were required to provide Russell Cellular, as Verizon's authorized dealer, with personal, account, business, device, and other sensitive information, including the PII described herein.

190. Verizon knew that customers would not have entrusted Russell Cellular with their PII absent assurances that Verizon would employ reasonable safeguards to protect that information from unauthorized access, disclosure, theft, and misuse and ensure the same by Russell Cellular, and that it would limit the persons to whom such information was exposed.

191. Plaintiffs and Class Members entered into and maintained their contractual relationships with Verizon, provided Verizon with their PII, and continued to do business with Verizon in reasonable reliance on Verizon's representations and promises concerning the privacy, confidentiality, and security of customer information in its Privacy Policy.

192. Plaintiffs and Class Members reasonably expected that Verizon would devote sufficient resources to overseeing Russell Cellular and ensure that Russell Cellular complied with cybersecurity, access controls, employee training, monitoring, incident detection, and breach prevention consistent with its contractual commitments and representations regarding customer privacy and security, and that their sensitive information would not be shared with third parties other than as represented in the Privacy Policy.

193. Plaintiffs and Class Members fully performed their obligations under their contracts with Verizon or were otherwise excused from performance. Among other things, Plaintiffs and Class Members provided the information required to obtain and maintain wireless services and paid for the products and services they received to Russell Cellular and paid for their equipment and services.

194. Verizon was obligated by the Privacy Policy and the law to comply with requirements of the Federal Trade Commission Act, 15 U.S.C. § 45(a). Pursuant to its promise to Plaintiffs and the other Class Members, Verizon was also required to ensure that Russell Cellular complied with the aforementioned laws.

195. Verizon breached its contractual obligations and express promises by failing to implement and maintain reasonable and appropriate safeguards to protect Plaintiffs' and Class Members' PII from unauthorized access, disclosure, exfiltration, theft, and misuse from Russell Cellular.

196. Verizon breached its contractual obligations and express promises by failing to restrict PII to only those employees that need to know.

197. Verizon breached its contractual obligations and express promises by its continuous, systematic, and regular practice of sharing PII with third parties without satisfactory safeguards and supervision.

198. Verizon further breached its contractual obligations by failing to adequately assess foreseeable cybersecurity risks, failing to implement appropriate access controls, failing to adequately monitor systems containing customer information, failing to maintain adequate intrusion-detection measures, and otherwise failing to employ reasonable cybersecurity practices.

199. Verizon further breached its contractual obligations by failing to adequately oversee, monitor, and ensure the security of customer information maintained through its authorized retail network, including customer information maintained by Russell Cellular.

200. Verizon breached its contractual obligations in its Privacy Policy when it allowed Plaintiffs' and the other Class Members' PII to be used without proper and regulatory-compliant security precautions, restrictions, and controls.

201. Verizon further breached its contractual obligations by failing to timely identify, investigate, contain, remediate, and respond to the unauthorized access that resulted in the Data Breach.

202. Verizon also breached its obligations by failing to timely and accurately notify affected individuals regarding the nature, scope, and consequences of the Data Breach and the information compromised therein.

203. Rather than comply with its contractual obligations and representations, Verizon failed to implement, maintain, monitor, and enforce reasonable security measures sufficient to protect the information entrusted to it by Plaintiffs and Class Members.

204. The Data Breach and resulting exposure of Plaintiffs' and Class Members' PII would not have occurred had Verizon complied with its contractual obligations and implemented reasonable measures to oversee and safeguard the information entrusted to Russell Cellular, as its registered dealer

205. As a direct and proximate result of Verizon's contractual breaches, Plaintiffs' and Class Members' PII was accessed, compromised, exposed, exfiltrated, and placed into the hands of unauthorized third parties.

206. As a direct and proximate result of Verizon's breaches, Plaintiffs and Class Members have suffered actual damages, including but not limited to the loss of the confidentiality and value of their PII, lost time, lost opportunity costs, out-of-pocket expenses, mitigation costs, and the ongoing costs associated with monitoring and protecting against fraud, identity theft, account compromise, phishing attacks, SIM-swapping attacks, and other misuse of their information.

207. Plaintiffs and Class Members have also suffered the loss of the benefit of their bargain. A portion of the value of the products and services purchased from Verizon included Verizon's promises and obligations to safeguard customer information and maintain reasonable security measures. Plaintiffs and Class Members did not receive the benefit of that bargain because Verizon failed to provide the level of data security and protection that it promised.

208. Plaintiffs and Class Members have suffered diminution in the value of their PII and have been deprived of the ability to control how that information is maintained, protected, and disclosed.

209. Plaintiffs and Class Members continue to face a substantial and ongoing risk of future harm because their PII remains in the possession of unauthorized third parties and may be used for fraudulent or unlawful purposes in the future.

210. Verizon engaged in unfair and deceptive practices with regard to the security of Plaintiffs' and Class Members' PII. Verizon engaged in an unfair and deceptive practice when it pledged to protect consumer information but did not have, or did not follow, sufficient procedures and practices for the secure handling of PII by its workforce and third-party business associates. Verizon did not act equitably when it failed to make good on a promise that consumers' PII will be protected by physical, electronic, and procedural safeguards that comply with federal regulations. Verizon engaged in an unfair practice when it shared Plaintiffs' and Class Members' PII with third parties without ensuring the safe disposal of the PII after the third-party business relationship terminated. Verizon's unfair and deceptive practices exposed unsuspecting customers to data theft and injury, while Verizon retained the profits of its business without compensating Plaintiffs and the other Class Members for the damage it caused them.

211. As a direct and proximate result of Verizon's breach of contract, Plaintiffs and Class Members have suffered and will continue to suffer damages in an amount to be determined at trial.

212. Plaintiffs and Class Members are entitled to recover all damages available at law and in equity, together with pre-judgment interest, post-judgment interest, costs, attorneys' fees where authorized, and all other relief permitted by law.

213. Plaintiffs seek such other relief as the Court deems just and proper.

**Count 5**
**Unjust Enrichment**
**(Against All Defendants)**
**(On behalf of Plaintiffs and the Nationwide Class)**

214. Plaintiffs, individually and on behalf of the Class, incorporate by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

215. This count is brought in the alternative to Plaintiffs' breach of implied contract claim.

216. Plaintiffs and Class Members conferred a benefit on Defendants when they paid Defendants for their goods and services and provided their PII and other valuable information to Defendants.

217. Upon information and belief, a portion of the monies paid to Defendants was intended to cover the costs associated with providing secure services and implementing reasonable measures to safeguard Plaintiffs' and Class Members' PII or Verizon's obligations to oversee Russell Cellular.

218. Defendants, however, failed to secure Plaintiffs' and Class Members' PII and, therefore, did not provide adequate data security in return for the benefit Plaintiff and Class Members provided.

219. Defendants would not be able to carry out an essential function of their regular business without the money obtained in the ordinary course of business and PII provided by Plaintiffs and Class Members. Plaintiffs and Class Members expected that Defendants or anyone in Defendants' position would use a portion of that revenue to fund adequate data security practices.

220. Defendants' retention of the benefits conferred by Plaintiffs and Class Members is inequitable because Defendants failed to provide the level of data security and protection that Plaintiffs and Class Members reasonably expected and for which they paid.

221. Defendants knew that Plaintiffs and Class Members conferred a benefit upon them, which Defendants accepted. Defendants profited from these transactions and used the PII of Plaintiffs and Class Members for business purposes; while failing to use the payments they received for adequate data security measures that would have secured Plaintiff's' and Class Members' PII and prevented the Data Breach.

222. If Plaintiff and Class Members knew that Defendants had not reasonably secured their PII, they would not have provided their PII to Defendants.

223. Defendants enriched themselves by avoiding or delaying expenditures necessary to implement reasonable cybersecurity measures, monitoring systems, employee training, access controls, and other safeguards that would have reduced the risk of unauthorized access to Plaintiffs' and Class Members' PII, or in the case of Verizon, by failing to oversee Russell Cellular. Rather than adequately investing in the protection of the sensitive information entrusted to them, Defendants retained the benefits conferred by Plaintiffs Members while exposing their PII to an unreasonable risk of compromise. Plaintiffs and Class Members suffered harm as a direct and proximate result of Defendants' failure to provide reasonable data security.

224. Under the principles of equity and good conscience, Defendants should not be permitted to retain the benefits that Plaintiff and Class Members conferred upon them because Defendants failed to adequately protect their PII. Plaintiffs and the proposed Class would not have provided their PII to Defendants had they known Defendants would not adequately protect their PII.

225. Plaintiffs and Class Members have no adequate remedy at law.

226. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered or will suffer injuries described herein.

227. Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them because of Defendants' misconduct and the Data Breach Defendants caused. In the alternative, Defendants should be compelled to refund the amounts that Plaintiff and Class Members overpaid to Defendants.

228. Plaintiffs also seek such other relief as the Court may deem just and proper.

**Count 6**
**Violations of Missouri Merchandising Practices Act,**
**RSMo. § 407.010 *et seq*.**
**(Against Defendant Russell Cellular, Inc.)**
**(On Behalf of Plaintiffs and the Nationwide Class)**

229. Plaintiffs, individually and on behalf of the Class, incorporate by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

230. RSMo. § 407.020 prohibits the use of any "deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce"…

231. An "unfair practice" is defined by Missouri law, 15 CSR 60-8.020, as any practice which:

(A) Either-

1. Offends any public policy as it has been established by the Constitution, statutes or common law of this state, or by the Federal Trade Commission, or its interpretive decisions; or

2. Is unethical, oppressive or unscrupulous; and

(B) Presents a risk of, or causes, substantial injury to consumers.

232. An "unfair practice is defined by Missouri law, 15 CSR 60-8.020 (1)(B) provides that an "Unfair Practice in General" is

(1) An unfair practice is any practice which –

(A) Either –

1. Offends any public policy as it has been established by the Constitution, statutes or common law of this state, or by the Federal Trade Commission, or its interpretive decisions; or

2. Is unethical, oppressive or unscrupulous; and

(B) Presents a risk of, or causes, substantial injury to consumers.

233. 15CSR 60-8.040 provides that an "Unfair Practice is: An unfair practice for any person in connection with the advertisement or sale of merchandise to violate the duty of good faith in solicitation, negotiation and performance, or in any manner fail to act in good faith.

234. Plaintiffs and Russell Cellular are "persons" within the meaning of section 407.010 (5).

235. Merchandise is defined by the MMPA, to include the providing of "services" and, therefore, encompasses cellular and data privacy services. Merchandise is defined broadly by the MMPA to include goods and services. The wireless telecommunications products and services purchased by Plaintiffs and Class Members from Russell Cellular constitute "merchandise" within the meaning of Mo. Rev. Stat. § 407.010.

236. The wireless products and services purchased by Plaintiffs and Class constitute merchandise within the meaning of the MMPA.

237. As set forth herein, Russell Cellular's acts, practices and conduct violate section 407.010(1) in that, among other things, Russell Cellular has used and/or continues to use unfair practices, concealment, suppression and/or omission of material facts in connection with the advertising, marketing, and offering for sale of wireless telecommunication product and services associated with their services. Such acts offend the public policy established by Missouri statute and constitute an "unfair practice" as that term is used in Missouri Revised Statute 407.020(1).

238. Russell Cellular's unfair, deceptive, and unlawful practices include, among other things: (1) representing that they would maintain reasonable safeguards to protect customer information; (2) failing to implement and maintain reasonable data-security measures sufficient to protect Plaintiffs' and Class Members' PII; (3) failing to adequately monitor, detect, and respond to unauthorized access to customer information; and (4) failing to timely and fully disclose the nature and scope of the Data Breach.

239. Russell Cellular's conduct also violates the enabling regulations for the MMPA because it: (1) offends public policy; (2) is unethical, oppressive and unscrupulous; (3) causes substantial injury to consumers; (4) it is not in good faith; (5) is unconscionable; and (6) is unlawful. *See* Mo Code Regs. Ann tit. 15, Section 60-8.

240. As a direct and proximate cause of Russell Cellular's unfair and deceptive acts, Plaintiffs and Class Members have suffered damages in that they (1) paid for products and services that were represented to include reasonable safeguards for customer information but did not receive the benefit of that bargain and (2) paid for privacy protections that they did not receive. In this respect, Plaintiffs and Class Members have not received the benefit of the bargain and have suffered an ascertainable loss.

241. As a result of Russell Cellular's violations of the MMPA, Plaintiffs and Class suffered ascertainable losses and are entitled to recover actual damages, attorneys' fees, costs, and all other relief available under Mo. Rev. Stat. § 407.025.

**Count 7**
**Violation Of New York General Business Law § 349**
**(Against All Defendants)**
**(On Behalf of Plaintiff Adessa and the New York Subclass)**

242. Plaintiff Adessa, individually and on behalf of the New York Subclass, incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

243. This claim is asserted pursuant to New York General Business Law § 349, which declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

244. Defendants are "person[s], firm[s], corporation[s] or association[s] or agent[s] or employee[s] thereof" within the meaning of N.Y. Gen. Bus. Law § 349(b).

245. At all relevant times, Defendants were engaged in "business," "trade," or "commerce" within the meaning of N.Y. Gen. Bus. Law § 349(a).

246. Plaintiff Adessa and New York Subclass Members are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

247. At all relevant times, Defendants engaged in trade and commerce within the State of New York and provided wireless telecommunications products and services to customers throughout New York, including Adessa and members of the New York Subclass.

248. Defendants engaged in deceptive acts and practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in New York, in violation of N.Y. Gen. Bus. Law § 349, including by:

a) failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Adessa's PII, which was a direct and proximate cause of the Data Breach;

b) failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures, which was a direct and proximate cause of the Data Breach;

c) failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Adessa's PII, including, but not limited to, duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d) misrepresenting that it would protect the privacy and confidentiality of Plaintiff Adessa's PII, including by implementing and maintaining reasonable security measures;

e) misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Adessa's PII, including, but not limited to, duties imposed by the FTC Act, 15 U.S.C. § 45,

f) failing to timely and adequately notify Plaintiff Adessa of the Data Breach;

g) omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff Adessa's PII; and

h) omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Adessa's, including, but not limited to, duties imposed by the FTC Act, 15 U.S.C. § 45.

249. Defendants' conduct was consumer-oriented because Defendants marketed, sold, and provided wireless products and services to the general public and made uniform representations concerning the collection, storage, maintenance, privacy, confidentiality, and security of customer information.

250. Defendants represented to customers, including Adessa and members of the New York Subclass, that they employed reasonable administrative, technical, and physical safeguards to protect customer information from unauthorized access, use, disclosure, alteration, and destruction and that their PII would not be shared with unauthorized third parties and that such third party sharing would be limited.

251. Defendants further represented that they maintained security measures designed to safeguard customer PII and protect against unauthorized access to customer PII.

252. These representations were material to consumers and businesses alike because customers reasonably expect telecommunications providers and their authorized retailers to implement and maintain adequate safeguards to protect sensitive customer PII entrusted to them.

253. Contrary to Defendants' representations, Defendants failed to implement, maintain, monitor, and enforce reasonable cybersecurity measures sufficient to protect customer information from unauthorized access, disclosure, exfiltration, and misuse.

254. Defendants further failed to disclose material facts concerning deficiencies in their cybersecurity practices, security controls, monitoring systems, access restrictions, and breach-detection capabilities.

255. Defendants knew or should have known that customers, including Adessa and members of the New York Subclass, would reasonably rely on Defendants' representations and omissions concerning the privacy, confidentiality, and security of customer information.

256. Defendants' representations, omissions, and concealment of material facts were likely to mislead a reasonable consumer acting reasonably under the circumstances.

257. Defendants' deceptive acts and practices were directed at the public generally and affected consumers and businesses throughout New York and the United States.

258. As a direct and proximate result of Defendants' deceptive acts and practices, Adessa and members of the New York Subclass suffered injury and ascertainable losses, including but not limited to the loss of the value of their information, loss of the benefit of their bargain, out-of-pocket expenses, mitigation costs, lost time, and the increased risk of fraud, identity theft, account compromise, phishing attacks, SIM-swapping attacks, and other misuse of their information.

259. As a direct and proximate cause of Defendants' unfair and deceptive trade practices, Plaintiff Adessa and New York Subclass Members were damaged because: (a) they paid for data security protection they did not receive; (b) their PII was improperly disclosed to unauthorized individuals; (c) the confidentiality of their PII has been breached; (d) they were deprived of the value of their PII, for which there is a well-established national and international market; (e) of lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; (f) of loss of potential value of their PII; (g) of overpayment for the services that were received without adequate data security and loss of the benefit of their bargains; (h) of actual identity theft, account compromise, phishing attacks, SIM-swapping attacks; (i) the continued risk to their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants' to undertake appropriate and adequate measures to protect the PII in their possession; and (j) nominal damages.

260. Plaintiff Adessa and members of the New York Subclass were injured because they paid for products and services that were represented as being accompanied by reasonable privacy and security protections but did not receive the level of security and protection represented by Defendants.

261. Defendants' violations of New York General Business Law § 349 were substantial factors in causing Adessa's and New York Subclass Members' injuries.

262. Defendants' deceptive and unlawful acts and practices complained of herein affected consumers and the public interest and consumers at large, including at least hundreds of thousands, if not millions, of New Yorkers affected by the Data Breach. Defendants' deceptive acts and practices were likely to and did in fact deceive the public at large and reasonable consumers, including Plaintiff Adessa, regarding Defendants' data security measures and supervision of sensitive data entrusted to it.

263. Defendants' violations present a continuing risk to Plaintiff Adessa and New York Subclass Members.

264. Pursuant to New York General Business Law § 349(h), Adessa and New York Subclass Members seek actual damages, statutory damages where applicable, injunctive relief, attorneys' fees, costs, and such other relief as the Court deems just and proper.

**Count 8**
**Violation Of the Texas Deceptive Trade Practices–Consumer Protection Act**
**Tex. Bus. & Com. Code § 17.41 *et seq.***
**(Against All Defendants)**
**(On Behalf of the Plaintiff Burns and the Texas Subclass)**

265. Plaintiff Burns incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

266. This claim is brought pursuant to the Texas Deceptive Trade Practices–Consumer Protection Act ("DTPA"), Tex. Bus. & Com. Code § 17.41 *et seq.*

267. Defendants are "person[s]," as defined by Tex. Bus. & Com. Code § 17.45(3).

268. At all relevant times, the Plaintiff Burns and members of the Texas Subclass were consumers, as defined by Tex. Bus. & Com. Code § 17.45(4), because they sought and acquired goods and services from Defendants by purchase or lease.

269. Defendants engaged in trade and commerce within the State of Texas and marketed, sold, and provided wireless telecommunications products and services to Plaintiff Burns and members of the Texas Subclass.

270. In connection with the sale and provision of those products and services, Defendants represented that they maintained reasonable administrative, technical, and physical safeguards designed to protect customer information from unauthorized access, disclosure, theft, and misuse.

271. Defendants further represented that they maintained security measures designed to safeguard customer information and protect against unauthorized access to customer data.

272. Defendants engaged in false, misleading, or deceptive acts and practices, in violation of Tex. Bus. & Com. Code § 17.46(b), including:

a) Representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

b) Representing that goods or services are of a particular standard, quality or grade, if they are of another;

c) Advertising goods or services with intent not to sell them as advertised; and

d) Failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

273. Defendants' false, misleading, and deceptive acts and practices include:

a) Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Burns's and Texas Subclass Members' PII, which was a direct and proximate cause of the Data Breach;

b) Failing to identify and remediate foreseeable security and privacy risks and sufficiently improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c) Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Burns's and Texas Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Texas's data security statute, Tex. Bus. & Com. Code § 521.052, which was a direct and proximate cause of the Data Breach;

d) Misrepresenting that they would protect the privacy and confidentiality of Plaintiff Burns's and Texas Subclass Members' PII, including by implementing and maintaining reasonable security measures;

e) Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Burns's and Texas Subclass

Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Texas's data security statute, Tex. Bus. & Com. Code § 521.052;

f) Omitting, suppressing, and concealing the material fact that they did not properly secure Plaintiff Burns's and Texas Subclass Members' PII; and

g) Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Burns's and Texas Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Texas's data security statute, Tex. Bus. & Com. Code § 521.052.

274. Defendants' representations regarding privacy, confidentiality, and data security were material to the purchasing decisions of Plaintiff Burns and members of the Texas Subclass because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of consumers' PII.

275. Contrary to those representations, Defendants failed to implement, maintain, monitor, and enforce reasonable cybersecurity measures sufficient to protect customer information from unauthorized access, disclosure, exfiltration, and misuse.

276. Defendants further failed to disclose material facts concerning deficiencies in their cybersecurity practices, security controls, monitoring systems, access restrictions, and breach-detection capabilities.

277. Defendants knew or should have known that consumers would rely upon their representations concerning the privacy, confidentiality, and security of customer information.

278. Plaintiff Burns and members of the Texas Subclass reasonably relied upon Defendants' representations and omissions when purchasing and maintaining wireless products and services from Defendants.

279. Had Defendants disclosed to Plaintiff Burns and the Texas Subclass Members that their data systems were not secure and, thus, vulnerable to attack, Defendants would have been unable to continue in business, and they would have been forced to adopt reasonable data security measures and comply with the law. Defendants were entrusted with sensitive and valuable PII concerning millions of consumers, including Plaintiff Burns and Texas Subclass Members. Defendants accepted the responsibility of protecting the data while keeping the inadequate state of its security controls secret from the public. Accordingly, Plaintiff Burns and Texas Subclass Members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

280. Defendants had a duty to disclose the above facts due to the circumstances of this case, the sensitivity and extent of the PII in their possession, and the generally accepted professional standards. Such a duty is implied by law due to the nature of the relationship between consumers, including Plaintiff Burns and Texas Subclass Members, and Defendants, because consumers are unable to fully protect their interests with regard to their data, and placed trust and confidence in Defendants. Defendants' duty to disclose also arose from their:

a) Possession of exclusive knowledge regarding the security of the data in their systems;

b) Active concealment of the state of their security; and/or

c) Incomplete representations about the security and integrity of their computer and data systems, while purposefully withholding material facts from Plaintiff Burns and Texas Subclass Members that contradicted these representations.

281. Defendants engaged in unconscionable actions or courses of conduct, in violation of Tex. Bus. & Com. Code Ann. § 17.50(a)(3). Defendants engaged in acts or practices which, to consumers' detriment, took advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree.

282. Consumers, including Plaintiff Burns and Texas Subclass Members, lacked knowledge about deficiencies in Defendants' data security because this information was known exclusively by Defendants. Consumers also lacked the ability, experience, or capacity to secure the PII in Defendants' possession or to fully protect their interests with regard to their data. Plaintiff Burns and Texas Subclass Members lack expertise in information security matters and do not have access to Defendants' systems in order to evaluate their security controls. Defendants took advantage of their special skill and access to PII to hide their inability to protect the security and confidentiality of Plaintiff Burns's and Texas Subclass Members' PII.

283. Defendants intended to take advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree, with reckless disregard of the unfairness that would result. The unfairness resulting from Defendants' conduct is glaring, flagrant, complete, and unmitigated. The Data Breach, which resulted from Defendants' unconscionable business acts and practices, exposed Plaintiff Burns and Texas Subclass Members to a wholly unwarranted risk

to the safety of their PII and the security of their identity or credit, and worked a substantial hardship on a significant number of consumers. Plaintiff Burns and Texas Subclass Members cannot mitigate this unfairness because they cannot undo the Data Breach.

284. Defendants acted intentionally, knowingly, and maliciously to violate Texas's Deceptive Trade Practices Act, and recklessly disregarded Plaintiff Burns's and Texas Subclass Members' rights.

285. As a direct and proximate result of Defendants' false, misleading, and deceptive acts and practices, Plaintiff Burns and members of the Texas Subclass suffered injuries and losses, including but not limited to loss of the value of their PII, loss of the benefit of their bargain, out-of-pocket expenses, mitigation costs, lost time, and the increased risk of fraud, identity theft, account compromise, phishing attacks, SIM-swapping attacks, and other misuse of their information; overpayment for Defendants' services; loss of the value of access to their PII; and the value of identity protection services made necessary by the Data Breach. Defendants' unconscionable and deceptive acts or practices were a producing cause of Plaintiff Burns' and Texas Subclass Members' injuries, ascertainable losses, economic damages, and non-economic damages, including their mental anguish.

286. Plaintiff Burns and members of the Texas Subclass paid for products and services that were represented as being accompanied by reasonable privacy and security protections but did not receive the level of security and protection represented by Defendants.

287. Contemporaneously with the filing of this action, Plaintiff Burns provided Defendants with written notice pursuant to Tex. Bus. & Com. Code § 17.505 on June 11, 2026.

288. Plaintiff Burns reserves the right to amend or supplement this Complaint following expiration of the applicable notice period, including to seek economic damages, additional

damages, attorneys' fees, costs, and all other relief available under the Texas Deceptive Trade Practices–Consumer Protection Act.

289. Contemporaneous with the filing of this Consolidated Complaint, pursuant to Tex. Bus. & Com. Code Ann. § 17.501, Plaintiff Burns's counsel will send to the Consumer Protection Division a copy of the written notice sent to Defendants.

290. Plaintiff Burns and members of the Texas Subclass seek such other and further relief as the Court deems just and proper.

**Count 9**
**Injunctive/Declaratory Relief**
**(Against All Defendants)**
**(On behalf of Plaintiffs and the Nationwide Class)**

291. Plaintiffs, individually and on behalf of the Class, incorporate by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

292. Under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief.

293. Defendants owe duties to Plaintiffs and Class Members to implement and maintain reasonable data-security measures sufficient to safeguard Plaintiffs' and Class Members' PII from unauthorized access, disclosure, and exfiltration.

294. Upon information and belief, Defendants continue to possess PII belonging to Plaintiffs and Class Members.

295. An actual controversy exists regarding whether Defendants' current data-security measures are adequate to protect Plaintiffs' and Class Members' PII from further unauthorized access, disclosure, and misuse. Plaintiffs allege that Defendants' data-security measures remain

inadequate, and Plaintiffs and Class Members continue to face an ongoing risk of harm as a result of the Data Breach and Defendants' continuing possession of their PII.

296. Pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, that:

a) Defendants owe legal duties to adequately safeguard the PII of Plaintiffs and Class Members within their care, custody, and control;

b) Defendants breached those duties by failing to implement and maintain reasonable data-security measures sufficient to prevent the Data Breach;

c) Defendants' existing data-security measures are inadequate to satisfy their duties to protect Plaintiffs' and Class Members' PII; and

d) Defendants' ongoing failure to implement reasonable data-security measures continues to cause harm to Plaintiffs and Class Members.

297. This Court should also issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with industry standards to protect the PII of Plaintiffs and Class Members within Defendants' custody, care, and control, including, as appropriate:

a) providing adequate credit monitoring, identity-theft protection, and related mitigation services to Plaintiffs and Class Members;

b) engaging qualified third-party security auditors and penetration testers to conduct periodic testing, audits, simulated attacks, and vulnerability assessments of Defendants' systems, networks, and servers;

c) promptly correcting any deficiencies identified by such audits, testing, assessments, or monitoring;

d) encrypting, anonymizing, or otherwise protecting PII within Defendants' systems to the extent practicable;

e) deleting or purging PII that Defendants no longer have a legitimate business or legal need to retain;

f) implementing automated security monitoring, intrusion-detection, and incident-response measures;

g) auditing, testing, and training personnel responsible for data security and incident response;

h) segmenting systems and implementing firewalls and access controls so that compromise of one system does not permit unauthorized access to other portions of Defendants' systems, networks, or servers;

i) conducting regular database scanning, vulnerability assessments, and security checks; and

j) implementing and maintaining routine employee training concerning cybersecurity risks, data-security practices, breach detection, and incident response.

298. If injunctive relief is not issued, Plaintiffs and Class Members will suffer irreparable injury and lack an adequate legal remedy to prevent another data breach or cybersecurity incident involving their PII. Monetary relief alone cannot fully remedy the continuing risk that Plaintiffs' and Class Members' PII will be subject to further unauthorized access, disclosure, or misuse.

299. The hardship to Plaintiffs and Class Members if injunctive relief is not granted exceeds any hardship to Defendants if such relief is issued. Plaintiffs and Class Members face continuing risks of fraud, identity theft, account compromise, phishing attacks, SIM-swapping

attacks, and other misuse of their PII, whereas Defendants are already legally obligated to maintain reasonable data-security measures.

300. Issuance of the requested injunctive relief will not disserve the public interest. To the contrary, such relief would benefit the public by reducing the risk of future unauthorized access to sensitive information and preventing further harm to Plaintiffs and Class Members, and others whose information remains in Defendants' possession.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class and Subclasses, respectfully request that the Court enter judgment in their favor and against Defendants and award the following relief:

A. Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23 and appoint Plaintiffs as Class and Subclass Representatives and their counsel as Class and Subclass Counsel;

B. Enter appropriate declaratory and injunctive relief, including requiring Defendants to implement and maintain reasonable data-security measures and safeguards sufficient to protect the PII of Plaintiffs and Class and Subclass Members;

C. Award compensatory, consequential, actual, and general damages, including nominal damages where appropriate, in an amount to be determined at trial;

D. Award statutory damages, punitive damages, or exemplary damages to the extent permitted by applicable law;

E. Order disgorgement, restitution, and all other equitable relief available as a result of Defendants' unlawful acts, omissions, and practices;

F. Award Plaintiffs and Class and Subclass Members their reasonable attorneys' fees, costs, expenses, and disbursements as permitted by law;

G. Award pre-judgment and post-judgment interest as permitted by law; and

H. Grant such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial on all claims so triable.

Dated: June 12, 2026

Respectfully submitted,


*/s/Maureen M. Brady*
Maureen M. Brady (MO#57800)
**McSHANE & BRADY, LLC**
4006 Central Street
Kansas City, MO 64111
Tel: (816) 888-8010
Fax: (816) 332-6295
mbrady@mcshanebradylaw.com

*Plaintiffs' Interim Liaison Counsel*

Amber L. Schubert* (CA Bar No.278696)
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union St, Ste 200
San Francisco, CA 94123
Tel: 415-788-4220
Fax: 415-788-0161
aschubert@sjk.law

Melissa R. Emert*
**KANTROWITZ GOLDHAMER GRAIFMAN PERLMUTTER & CARBALLO P.C.**
135 Chestnut Ridge Road-Suite 200
Montvale, NJ 07645
Tele: 845-356-2570
Fax: 845-356-4335
memert@kgglaw.com

*Plaintiffs' Interim Co-Lead Counsel*

Lynda Grant*
**THE GRANT LAW FIRM**
521 Fifth Avenue, 17th Floor
New York, NY 10175
Tele: 212-292-4441
Fax: 212-292-4442
lgrant@grantfirm.com

Grayson Wells, #73068(MO)
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gwells@stranchlaw.com

John F. Garvey #35879
Colleen Garvey #72809
**STRANCH, JENNINGS & GARVEY, PLLC**
701 Market Street, Suite 1510
St. Louis, Missouri 63101
Phone: (314) 390-6750
jgarvey@stranchlaw.com
cgarvey@stranchlaw.com

Kevin Laukaitis*
**LAUKAITIS LAW LLC**
954 Avenida Ponce De Leon
Suite 205, #10518
San Juan, PR 00907
Tel: (215) 789-4462
klaukaitis@laukaitislaw.com

*Additional Counsel for Plaintiffs and the Proposed Class*

*admitted pro hac vice

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on June 12, 2026, the foregoing was filed electronically with the Clerk of Court using the CM/ECF System and was thereby served on all counsel of record.

*/s/ Maureen M. Brady*____________
Maureen M. Brady____________